UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PETR DMITRIEV, DARIA LATOUR,
YUSUP OSMANOV, YURI RYAZANOV,
ARSENIY SHCHEPIN, GEORGY
SHCHEPIN, and OLEG SEMENETS
     Plaintiffs

    v.

ANDREI MANN and MICHAEL HELLMAN,
    Defendants

CIVIL ACTION NO.

## COMPLAINT

### Introduction

Defendant Andrei Mann used his family name and business contacts in Russia, with support and assistance from defendant Michael Hellman, to convince plaintiffs to loan Andrei Mann millions of dollars under false pretenses with no intent to repay the plaintiffs. Andrei Mann then transferred the monies out of Russia to countries, including the United States where Michael Hellman and Andrei Mann are citizens. Then, while subject to a Russian criminal investigation, Andrei Mann fled Russia for the United States where he remains today.

This is an action by the plaintiffs for conversion, fraud, breach of contract, civil conspiracy, unjust enrichment to recover approximately $17,000,000 USD converted by Andrei Mann and Michael Hellman.

### Parties

1.    Plaintiff Petr Dmitriev is an individual with Russian and Israeli citizenship who is domiciled in Bat-Yam, Israel.

2.      Plaintiff Daria Latour is an individual who is a citizen of Russia and is domiciled in Moscow.

3.      Plaintiff Yusup Osmanov is an individual who is a citizen of Russia and is domiciled in Moscow.

4.      Plaintiff Yuri Ryazanov is an individual who is a citizen of Russia and is domiciled in Moscow.

5.      Plaintiff Arseniy Shchpein, Daria Latour's son, is an individual who is a citizen of Russia and is domiciled in Moscow.

6.      Plaintiff Georgy Shchepin, Daria Latour's other son, is an individual who is a citizen of Russia and is domiciled in Strezhevoy.

7.      Plaintiff Oleg Semenets is an individual who is a citizen of Russia and is domiciled in the Moscow region of Shchelkovo.

8.      Defendant Andrei Y. Mann ("Mann"), is an individual who was born and lived in Russia for much of his life, then became a United States citizen with a current address of 8855 Bay Parkway, Brooklyn, New York.

9.      Defendant Michael Hellman ("Hellman"), is an individual who is a United States citizen with an address of 61 Great Meadow Road in Newton, MA.

## Jurisdiction and Venue

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the suit is between citizens of a State and citizens or subjects of a foreign state, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because Hellman resides in the district and a substantial part of the events giving rise to the claims occurred in this judicial district.

### General Allegations

12.    For decades, Mann was known in Russia as a prominent and successful businessman from a respected family.

13.    Mann was the primary shareholder of S-Info, LLC ("S-Info"), a Massachusetts limited liability company with operations in Moscow.  Through S-Info, Mann ran a seemingly profitable newspaper and publishing house that produced periodicals, children's textbooks, and other products.

14.    Mann had many associates and friends in Russia's wealthiest circles.

15.    Through his professional reputation, Mann was able to convince the plaintiffs, his friends and associates, to loan him large sums of money, or entrust their money to him to invest.

16.    After almost a decade of deception and fraud, the plaintiffs discovered that Mann is not the successful business person he held himself out to be, and had defrauded them out of millions of dollars.

17.    In 2018, Mann absconded to the United States to evade civil and criminal liability in Russia.

18.    Hellman worked with Mann in Massachusetts during the relevant time period to create numerous business entities in Massachusetts that would receive funds from unwitting lenders and investors.

19.    On information and belief, Mann used these entities to distribute funds to his personal accounts and the accounts of his children.

20.     In addition to working with Mann to create these business entities, Hellman, using his Commonwealth of Massachusetts Notary seal, authenticated some of the loan agreements at issue in this Complaint.

21.     Hellman communicated with many of the plaintiffs at various times to reassure them that Mann would repay his debts and that everything was proceeding normally.

### Mann and Hellman's Interactions with Petr Dmitriev

22.     Petr Dmitriev ("Dmitriev") first met Mann in the late 1980s when Dmitriev worked as a correspondent and Mann as a supervisor at a medical newspaper.  They were on friendly terms.

23.     Although they did not see each other for many years, Dmitriev was aware that Mann had created a seemingly successful business in S-Info.

24.     In or about 2010 or 2011, Dmitriev and Mann renewed their friendship, at which time Mann represented that he was incredibly successful, S-Info was performing well, he had become a U.S. Citizen, and he had achieved great business success in the United States.

25.     Mann further represented that he regularly attracted large investments from numerous people and organizations and was always able to deliver high returns to his investors.

26.     On February 6, 2012, Mann convinced Dmitriev to provide a loan to him in the amount of $1,500,000 USD.  The loan was to be repaid in full, on an interest-free basis, on February 6, 2013.  See Certified English Translation and Russian Original February 6, 2012 Loan Agreement, attached as **Exhibit 1**.

27.     Mann informed Dmitriev that that the interest from the loan would be paid through S-Info but that the loan agreement itself had to state the loan was on an interest-free

basis for U.S. tax purposes. Dmitriev agreed because he trusted that S-Info had more than enough income to pay the interest on Mann's loan.

28.     Mann further stated that because he owned significant real estate in Russia and the United States, he would have no trouble repaying the loan.

29.     As security for the funds, Mann agreed "to provide 51 shares in the company CALLISTO MEDIA CORPORATION, allegedly registered in the United States and being the sole participant of S-info Publishing House in the Russian Federation . . . ."

30.     The loan agreement was executed in Moscow.

31.     Mann invited his colleague, Hellman, to come to Moscow from Massachusetts to witness the execution of the loan documents. While in Moscow, Hellman executed an Apostille with a Commonwealth of Massachusetts seal to notarize the loan documents.

32.     At all times relevant to this loan agreement, Hellman and Mann represented Hellman to be a neutral third party.

33.     Mann and Hellman represented to Dmitriev that Hellman had authority to notarize documents in Russia.

34.     Mann requested that the loan be paid to him personally, in cash, because that would be most convenient for Mann. Dmitriev found this request unusual because he knew the money was ultimately to be invested in the United States.

35.     Neither Hellman nor Mann disclosed to Dmitriev that the real reason the funds were to be paid in cash was so that Mann would be able to present the money as his own and conceal the source of the funds when transferring the ill-gotten money to his children and various business entities.

36.     Neither Hellman nor Mann disclosed to Dmitriev that Hellman was actually the owner and founder of CALLISTO MEDIA CORPORATION.

37.      Neither Hellman nor Mann disclosed that they had worked together for years to create numerous business entities in Massachusetts to conceal or destroy traces of asset withdrawals from Russia.

38.     The original loan agreement was extended six times, including as recently as March 5, 2018.  See Ex. 1.

39.     When each extension to the agreement was executed, Hellman personally came to Russia on each occasion to "notarize" the agreements.

40.     Hellman's presence and endorsement on the loan agreement extensions provided a false air of legitimacy to the deals, as Dmitriev felt he could rely on Hellman as a Massachusetts notary and neutral third party who repeatedly reassured Dmitriev that everything was above board.

41.     Mann never intended to and has not repaid the $1,500,000 USD loan made by Dmitriev.

42.     On information and belief Mann converted the funds for his personal use.

**Mann and Hellman's Interactions with the Latour/Shchepin Family**

43.     Daria Latour ("Latour") has known Mann since 1989.  She knew him to be the General Director and primary shareholder of S-Info, which Mann led Latour to believe was very profitable.  Latour's ex-husband, Dmitry Eduardovich Shchepin ("Dmitry") worked closely with Mann at S-Info from 1989 until about 2000.

44.     Latour and her family lived in Massachusetts for several years in the 1990s when Dmitry worked at S-Info's Boston location.  While living in Massachusetts, Mann introduced

Latour and her family to Hellman, who claimed to be his business partner and a representative of S-Info.

45.    Latour's family was very close with Mann and Hellman.  They celebrated holidays together and their children were friends.

46.    Latour and Dmitry moved back to Moscow in 2000 at which point they decided to separate.

47.    In 2001, Latour and Dmitry flew to Boston to meet with Mann at Mann's apartment, located at 314 Dartmouth Street, to discuss creating a trust for their children.

48.    Immediately after the meeting, Dmitry, Latour, and Mann went to Mann's office in Newton to meet with Hellman to further discuss the details of creating a trust.

49.    Mann and Hellman convinced Latour and Dmitry that they should deposit their money into a trust fund established with the American law firm, Choate Hall & Stewart LLP ("Choate") based in Boston.

50.    Hellman claimed that he had a relationship with Choate and would handle the legal aspects of the trust and depositing the money.

51.    Mann volunteered to serve as trustee.

52.    Based on Mann and Hellman's representations, Dmitry deposited $500,000 USD for his son, Georgy Shchepin ("Georgy"), and $500,000 USD for his son, Arseniy Shchepin ("Arseniy").

53.    Latour and Dmitry executed the trust documents at Choate's office, but did not have any interaction with Choate after that.

54.    Mann and Hellman warned Dmitry and Latour that they must never contact Choate directly, and informed them that all trust communications needed to go through Hellman.

This precaution, Mann and Hellman explained, was to make sure secure financial documents did not have to be sent to Russia where Dmitry then lived.

55.    Over the next several years, Mann and Hellman personally delivered purported trust-related documents to Latour and Dmitry in Russia. Mann and Hellman claimed that it was standard practice for Choate to have documents personally delivered to clients who lived outside of the United States.

56.    Mann and Hellman translated all documents from English into Russian, and Dmitry relied on these translations in signing paperwork and making trust-related decisions.

57.    Several times, Latour and Dmitry requested to withdraw funds from the trust for their children, but Mann repeatedly refused, stating it would be suspicious to Russian authorities if money from a U.S. trust fund was transferred to Russia, and that it could only be withdrawn by Latour or Dmitry from within the U.S. or Europe.

58.    In 2016, Hellman sent Dmitry and Latour a letter in English purportedly issued by Choate. The letter stated that the trust fund needed to be closed because the amount of money invested was too insignificant and that if Dmitry did not withdraw the money, close the trust, and transfer the funds back to Russia, all of the funds would be lost.

59.    This communication was startling to Dmitry and Latour because Mann had repeatedly warned them that they should never transfer funds from the trust to Russia. Dmitry in particular was reluctant to close a U.S.-based trust. They asked Mann and Hellman what they should do and why this was happening.

60.    Mann and Hellman explained that Choate did not want to do business with Russians. They stated that Arseniy and Georgy would lose their funds if the funds were not withdrawn from the Choate trust.

61.     Mann and Hellman assured Arseniy, Georgy, Dmitry, and Latour that they would be able to handle the work of closing the trust and that, given their experience in the U.S., they knew what they were doing.

62.     In June of 2016, based on Mann and Hellman's representations, Arseniy, Georgy, and Dmitry signed the paperwork to close the trust and transfer $1,200,000 USD from the trust to Russian bank accounts Mann opened in Arseniy and Georgy's names and from there to yet another account designated by Mann.  Mann insisted that the funds be transferred in this way so that he could then move the funds to a Swiss trust fund.

63.     From 2017 through 2019, Latour repeatedly asked Mann to withdraw funds from the Swiss trust to give to her sons.  Mann would call or email Latour from Massachusetts and reassure her that the money was fine, and he would transfer the funds.  Every now and then, Mann would have an associate deliver small amounts of cash to Georgy or Mann would transfer funds into Georgy's account from Mann's personal account or business accounts.  Arseniy never received any money.

64.     Despite repeated requests from Latour and Dmitry for proof that the funds were in a Swiss trust as promised and requests that the remaining funds be transferred to Arseniy and Georgy, Mann has not complied.

65.     Mann's fraud on the family also extends to Latour personally.  Mann entered into a loan agreement with Latour on September 12, 2008.  Latour agreed to give Mann $445,418 USD, and he agreed to repay her $6,000 USD monthly.  See Certified Translation and Original Russian September 2008 Loan Agreement, attached as **Exhibit 2**.

66.     When Mann refused to pay according to the agreement, Latour and Mann executed several extensions.  By January 1, 2014, Latour and Mann agreed to extend the

repayment deadline until November 3, 2017.  The amount to be repaid was calculated to be $494,760 USD.

67.    When the repayment date came, Mann claimed that he had invested the funds in some unnamed enterprise and was unable to return them or provide any documentation of the investment.

68.    Mann has never repaid the $494,760 USD he owes to Latour.

### Mann and Hellman's Interactions with Yusup Osmanov

69.    Yusup Osmanov ("Osmanov") met Mann in 1991 when they were introduced by a mutual friend in Moscow.

70.    Beginning in 1998, Osmanov and Mann entered into a business relationship in which Osmanov helped Mann locate and purchase real estate in Moscow and a country house outside of the city.  Mann, in turn, gave Osmanov a job as the head of the Moscow office of First Crandall Construction, Inc.

71.    Osmanov's duties included assisting Mann with personal finances, offering consulting services to clients, and executing real estate and promissory notes.

72.    Osmanov understood that First Crandall Construction, Inc. was a Massachusetts corporation registered in Hellman's name, but was owned by Mann.

73.    Beginning in 2007, Osmanov noticed that Mann was borrowing large sums of money from individual lenders to repay earlier debts he had taken on.  This scheme permitted Mann to refinance his debts for many years, but in 2016, Mann was unable to keep up with the massive debts he had incurred.

74.    Mann owned or was affiliated with a large number of U.S. companies and funds were transferred between all of them in an effort to repay Mann's debts, conceal assets, and withdraw funds.

75.    Osmanov periodically reminded Mann of the mounting debts Mann owed to numerous people in Russia, but Mann always reassured Osmanov that nothing was awry. Because Mann was his longtime employer and friend, Osmanov trusted Mann's representations.

76.    Over a period of years, Mann induced Osmanov to loan him money several times for what Mann described as "personal needs."  Mann assured Osmanov that he would be able to repay him, even though Mann never had any intention of doing so.

77.    In July of 2006, Hellman and Mann told Osmanov that they needed a loan to invest money into U.S.-based projects they were working on.

78.    They encouraged Osmanov to take out a loan in Spain, on behalf of their businesses, and guarantee the loan with property Osmanov owned in Spain.

79.    Osmanov was reluctant, but Mann manipulated him into believing that this was an opportunity for all of them to invest in profitable American enterprises.

80.    Eventually, Osmanov relented and on September 15, 2006, he signed a loan agreement with Hellman in the amount of $371,823 USD to loan funds to Lake Louise Realty Trust, which was created and administered by Hellman.  See September 15, 2006 Loan Agreement, attached as **Exhibit 3**.

81.    Hellman paid interest on the loan to Osmanov until 2014, and then the payments became irregular.  Hellman has stopped paying entirely since 2017.

82.    Osmanov has been unable to contact Hellman since 2017, and has not been repaid the remaining debt of $126,692.37 USD in principal and $13,425.40 USD in interest.

83.     On April 1, 2018, Mann and Osmanov summarized the debts Mann owed to Osmanov in a Loan Summary Agreement.  See Certified English Translation and Russian Original April 1, 2018 Loan Summary Agreement, attached as **Exhibit 4**.

84.     Mann acknowledged that he would owe Osmanov $6,924,866 USD and €367,500 EUR as of July 1, 2018.  See Ex. 4.

85.     These sums have never been repaid.

**Mann and Hellman's Interactions with Yuri Ryazanov**

86.     Yuri Ryazanov ("Ryazanov") and Mann met in 1993 when Ryazanov worked as the director of advertising at S-Info.

87.     Ryazanov became acquainted with Hellman in or about 1997-1998 when Hellman worked for S-Info's U.S. location.  Ryazanov and Hellman discussed advertising issues related to the company and met in Russia several times.

88.     With Hellman's assistance, Mann was able to convince Ryazanov to loan him money on numerous occasions:

    a.   On April 7, 2008, Mann and Ryazanov entered into a loan agreement in which Ryazanov loaned Mann $1,256,035 USD to be repaid by October 17, 2010 and €617,240 EUR on the same terms.  Ryazanov was reluctant to loan money to Mann at the time, but Hellman persuaded him by detailing the high profitability, solvency, and reliability of S-Info.

    b.   On April 9, 2009, Mann and Ryazanov entered into a loan agreement in which Ryazanov loaned Mann $3,467,938 USD and €2,117,000 EUR.

    c.   On March 10, 2016, Mann and Ryazanov entered into a supplemental loan agreement to the April 9, 2009 agreement in which Ryazanov agreed to extend the repayment deadline until December 31, 2016.

d.   On October 11, 2017, Mann and Ryazanov entered into an agreement in which Mann promised to repay the April 9, 2009 loan and the March 10, 2016 loan by December 31, 2017.  See Certified English Translation and Russian Original October 11, 2017 Agreement, attached as **Exhibit 5**.

89.    Despite these agreements, Mann only sporadically made payments to Ryazanov and made numerous false representations about the status of the money and when he would repay it.  For example, Mann represented that:

a.   Rather than paying Ryazanov directly, Mann was putting the payments into a U.S. bank account on Ryazanov's behalf.  Eventually, Mann would create a trust fund for Ryazanov and his family with the proceeds.

b.   When Ryazanov followed up with Mann about the creation of the trust fund, Mann informed him that it was very difficult for a non-U.S. citizen to establish a trust so it would take some time and an accumulation of money before the trust could be officially opened in Ryazanov's name.

90.    Over the years, Ryazanov had doubts about whether Mann was actually going to establish a trust on his behalf, but Hellman always put these doubts to rest by pointing to Hellman and Mann's successful establishment and administration of Dmitry Shchepin's trust at Choate.  Ryazanov worked with Dmitry and felt much more at ease about lending Mann money knowing that Dmitry had entrusted Mann with his sons' trust funds.

91.    Mann and Hellman's manipulations were eventually exposed when Mann failed to provide evidence that they opened a trust account in Ryazanov's name and all the funds Ryazanov had transferred to them were, in fact, gone.

92.    Mann never paid his debt to Ryazanov or created a trust on Ryazanov's behalf.

93.     Mann owes Ryazanov approximately $3,467,938 USD and €2,498,390 EUR.

**Mann and Hellman's Interactions with Oleg Semenets**

94.     Oleg Semenets ("Semenets") met Mann through Semenets' former student at Moscow State University in late 2015 or early 2016.

95.     Throughout their friendship, Mann portrayed himself to be a wealthy, successful businessman who owned significant real estate in both Russia and the United States worth millions.  Indeed, as the controlling shareholder of S-Info, Mann's solvency was never a question in Semenets' mind.

96.     In December 2016, Mann persuaded Semenets to loan him money by representing it as a smart investment in light of S-Info's vast financial success.  Mann falsely stated that he planned to create a new venture which promised to be as successful as S-Info, but he needed additional financing to finish the project's software development.

97.     When Semenets asked for more information about S-Info, Mann called Hellman in Massachusetts, who Semenets did not know personally, and asked him to report information about S-Info's U.S. profits for the year of 2016.  Hellman falsely reported that S-Info earned $10,000,000 USD that year.

98.      Finally convinced, Semenets loaned Mann money in 2016 and two times thereafter:

        a.  In 2016, Semenets loaned Mann $1,200,000 USD.

        b.  On January 1, 2017, Semenets loaned Mann $400,000 USD to be put into S-Info.  Semenets later learned that the money was never put into S-Info.

        c.  On March 5, 2018, Mann and Semenets entered into a loan agreement in which Semenets loaned Mann $150,000 USD and Mann agreed to repay this amount and the

outstanding debts he owed to Semenets by June 1, 2018.  <u>See</u> Certified English Translation and Russian Original March 5, 2018 Loan Agreement, attached as **<u>Exhibit 6</u>**.

99.     Semenets had no idea that Mann had other creditors or owed millions of dollars to numerous people throughout Russia.

100.     On or about May 1, 2019, Mann and Semenets met in Marbella, Spain to discuss the money that Mann owed.  During this conversation, Mann signed another contract agreeing to repay his debts.  <u>See</u> Certified English Translation and Russian Original May 1, 2019 Agreement, attached as **<u>Exhibit 7</u>**.

101.     A few months after this meeting, Mann sent Semenets bank statements showing that Mann had $62,687,478 USD in a Swiss bank account and was capable of repaying all of his debts with that money.

102.     Nevertheless, Mann never repaid his debts to Semenets.

## <u>PETR DMITRIEV v. ANDREI MANN</u>

### COUNT I
### Fraud

103.     The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

104.     Mann made numerous false representations about his relationship with Hellman, about the ownership of CALLISTO MEDIA CORPORATION, and about his intention and ability to pay back the loan made by Dmitriev.

105.     When entering into the loan agreement with Dmitriev on February 6, 2012, Mann did not intend to repay Dmitriev.

106.     Similarly, each time Mann persuaded Dmitriev to extend the loan deadline, Mann knew that he would never repay his debts.

107.    Mann fraudulently stated that he would repay Dmitriev and had the ability to repay Dmitriev because it was the only way to convince Dmitriev to loan him money.

108.    Dmitriev reasonably relied on Mann's false representations because Mann portrayed himself to be a successful businessman, a friend, and someone with integrity who repaid his debts.

109.    By relying on Mann's fraudulent statements, Dmitriev lost $1,500,000 USD.

**COUNT II**
**Breach of Contract**

110.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

111.    The February 6, 2012 loan agreement between Mann and Dmitriev and the March 5, 2018 extension of that agreement were valid contracts.

112.    Dmitriev performed his obligations under these contracts by loaning Mann $1,500,000 USD.

113.    Mann breached his contractual obligations by failing to pay back the money owed to Dmitriev.

114.    To date, Dmitriev has suffered a loss of $1,500,000 USD as a result of Mann's breach.

**COUNT III**
**Civil Conspiracy**

115.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

116.    Mann entered into a common design or agreement with his associate, Hellman, while in the Commonwealth of Massachusetts to defraud Russian citizens out of millions of dollars by taking out loans that would never be repaid.

117.    Specifically, Mann and Hellman agreed to defraud Dmitriev out of $1,500,000 USD by convincing him to loan Mann money despite knowing that Mann did not intent to repay the funds.

118.    Specifically, Mann and Hellman agreed to falsely represent to Dmitriev that Mann owned CALLISTO MEDIA CORPORATION to encourage him to loan Mann the money.

119.    Mann provided substantial assistance in furtherance of the agreement by flying from Massachusetts to Moscow, convincing Dmitriev to sign the loan agreement, and arranging for Hellman to come authenticate the documents.

## DARIA LATOUR v. ANDREI MANN

### COUNT IV
### Fraud

120.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

121.    Mann made numerous false representations to Latour throughout their friendship to convince her that he was a wealthy, successful business man who paid all of his debts.

122.    In September 2008, Mann manipulated Latour into loaning him $445,418 USD. Mann falsely represented that he would repay this loan in monthly installments.

123.    On March 11, 2014, Mann claimed that he needed more time to repay the loan and made additional false statements about his ability to repay Latour to convince her to sign an extension to their loan agreement that would give Mann until March 11, 2017 to repay Latour.

124.    As of March 11, 2014 when they executed the loan extension, Mann did not intend to repay Latour.

125.    Mann made these numerous false representations about his wealth and plans to repay Latour to convince her to sign the extension agreement.  Because Mann was a family friend and someone who presented himself to be successful, Latour reasonably relied on Mann's statements.

126.    As a result of Mann's fraud, Latour has suffered damages in the amount of $494,760 USD.

## COUNT V
## Breach of Contract

127.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

128.    The September 2008 loan agreement between Mann and Latour and the January 1, 2014 extension of that agreement were valid contracts.

129.    Latour performed her obligations under these contracts by loaning Mann $445,418 USD and then extending the repayment deadline.

130.    Mann breached his contractual obligations by failing to pay back the money owed to Latour by November 3, 2017.

131.    To date, Latour has suffered a loss of $494,760 USD as a result of Mann's breach.

## YUSUP OSMANOV v. ANDREI MANN

## COUNT VI
## Fraud

132.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

133.    Mann made numerous false representations to Osmanov throughout their friendship about his intention to repay his mounting debts.

134.    Mann convinced Osmanov to loan him money over a period of several years and promised to pay him back even though he had no intention of doing so.

135.    On April 1, 2018, Mann lied to Osmanov again by representing that he would repay all of his debts to Osmanov and executing a loan summary agreement in which Mann acknowledged owing Osmanov $6,924,866 USD and €367,500 EUR as of July 1, 2018.

136.    Mann never had any intention of repaying Osmanov.

137.    Osmanov reasonably relied on Mann's representations because Mann had convinced him that he had sufficient funds to repay his debts and presented himself as a successful businessman.

138.    As a result of Mann's fraud, Osmanov has suffered damages in the amount of $6,924,866 USD and €367,500 EUR.

## COUNT VII
## Breach of Contract

139.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

140.    The April 1, 2018 loan summary agreement between Mann and Osmanov was a valid contract in which Mann agreed to repay his debt to Osmanov by July 1, 2018.

141.    Osmanov performed his obligations under the loan agreements and loan summary agreement.

142.    Mann breached his contractual obligations by failing to pay back the money he acknowledged owing to Osmanov.

143.    Osmanov has suffered a loss of $6,924,866 USD and €367,500 EUR as a result of Mann's breach.

## YURI RYAZANOV v. ANDREI MANN

### COUNT VIII
### Fraud

144.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

145.    Mann was able to manipulate Ryazanov into loaning him significant amounts of money on several occasions, by falsely representing that he would repay the loans in a timely fashion by depositing the money into a trust account for Ryazanov.

146.    On October 11, 2017, Mann induced Ryazanov to enter into an agreement with him to extend the deadline of Mann's loan repayments until December 31, 2017.

147.    Mann did not intend to repay the money owed by that deadline.

148.    Ryazanov's reliance on Mann's representations was reasonable because Mann had conned Ryazanov into believing that Mann was a wealthy, successful business man who paid all of his debts.

149.    As a result of Mann's fraud, Ryazanov suffered damages in the amount of $3,467,938 USD and €2,498,390 EUR.

### COUNT IX
### Breach of Contract

150.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

151.    The October 11, 2017 loan repayment agreement between Mann and Ryazanov was a valid contract in which Mann agreed to repay his debt to Ryazanov by December 31, 2017.

152.    Ryazanov performed his obligations under this contract by extending the repayment period of the loans until December 31, 2017.

153.    Mann breached his contractual obligations by failing to pay back the money he owed Ryazanov.

154.    Ryazanov suffered damages in the amount of $3,467,938 USD and €2,498,290 EUR as a result of Mann's breach.

### ARSENIY SHCHEPIN AND GEORGY SHCHEPIN v. ANDREI MANN
**COUNT X**
**Fraud**

155.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

156.    In June of 2016, Mann deceived Arseniy and Georgy by representing that Choate was closing their trust because Choate did not want to do business with Russians.

157.    Mann further deceived Arseniy and Georgy by promising them that if they transferred the money to their Russian bank accounts and then to a different account, Mann would deposit the funds into a Swiss trust.

158.    Because Mann was a long-time family friend and associate of their father's, Arseniy and Georgy trusted Mann's representations about handling their money.

159.    In reliance on Mann's statements about Choate closing their trust, Arseniy and Georgy signed paperwork to close the trust account and ultimately transferred $1,200,000 USD to a bank account that Mann had selected in Russia.

160.    Mann never deposited the money into a Swiss trust as he had promised.

161.    Mann has refused to return the funds to Arseniy and Georgy, causing them to suffer damages in the amount of $1,200,000 USD.

## COUNT XI
## Civil Conspiracy

162.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

163.    Mann entered into a common design or agreement with Hellman to defraud Arseniy and Georgy out of their trust fund assets by convincing them that Choate was closing the trust and the only way to transfer the money to a Swiss trust would be to sign the funds over to Mann personally.

164.    Specifically, Mann met with Arseniy, Georgy, and Dmitry, and Hellman by telephone and through written correspondence, to mislead them into thinking that if they did not close their Choate trust account, they would lose their money.

165.    Mann reassured Arseniy and Georgy that he was acting in their best interest, and Hellman added legitimacy to the scheme by presenting the information to them as a Massachusetts-barred attorney.

166.    Arseniy and Georgy suffered damages in the amount of $1,200,000 USD as a result of Mann's and Hellman's actions.

## OLEG SEMENETS v. ANDREI MANN
## COUNT XII
## Fraud

167.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

168.    Mann made numerous false representations to Semenets throughout their friendship about his financial status, his ability pay back creditors, and his intention of using Semenets' money toward a new business venture.

169.    Mann convinced Semenets to loan him money over a period of several years and promised to pay him back even though he had no intention of doing so.

170.    On May 1, 2019, Mann met Semenets in Marbella, Spain to reassure Semenets that he would repay his loans to Semenets.  Mann convinced Semenets to allow him an extension to repay his debts.  Mann never had any intention of repaying Semenets.

171.    Semenets reasonably relied on Mann's representations because Mann had convinced him that he had sufficient funds to repay his debts and presented himself as a successful businessman.

172.    As a result of Mann's fraud, Semenets has suffered damages in the amount of $1,750,000 USD.

**COUNT XIII**
**Breach of Contract**

173.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

174.    The 2016, January 1, 2017, and March 5, 2018 loan agreements were valid contracts.  The May 1, 2019 extension to these contracts was also valid.

175.    Semenets performed his obligations under this contract by loaning Mann $1,750,000 USD and then extending the repayment period.

176.    Mann breached his contractual obligations by failing to pay back the money he owed Semenets.

177.    Semenets has suffered a loss of $1,750,000 USD as a result of Mann's breach.

## <u>ALL PLAINTIFFS v. ANDREI MANN</u>

### COUNT XIV
### Conversion

178.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

179.    Mann exercised acts of ownership, control, or dominion over vast sums of the plaintiffs' money.

180.    To date, all of Mann's debts to the plaintiffs are past due.  Mann has no right to his continued possession of the plaintiffs' funds because he has violated his obligations under the loan agreements and, in Arseniy and Georgy's cases, has outright stolen the money.

181.    Despite purporting to have funds in various off-shore accounts that would satisfy this debt, Mann has refused to repay the plaintiffs.

182.    As a result of Mann's conversion, the plaintiffs have suffered significant monetary damages.

### COUNT XV
### Unjust Enrichment

183.    The plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Complaint and hereby incorporate them by reference.

184.    The plaintiffs entrusted large sums of their money to Mann.

185.    Mann induced the plaintiffs into transferring money to him through fraudulent loan agreements, loan extensions, and transfers by convincing them that he was a trustworthy friend and successful businessman.

186.    It is inequitable for Mann to retain the plaintiffs' money in light of his fraudulent and deceptive conduct.

## PETR DMITRIEV v. MICHAEL HELLMAN

### COUNT XVI
### Fraud

187.    The plaintiffs repeat and reallege the allegations set forth in foregoing paragraphs

of the Complaint and hereby incorporate them by reference.

188.    Hellman made numerous false representations to Dmitriev about his relationship

with Mann, the ownership of CALLISTO MEDIA CORPORATION, and Mann's intention to

pay back the February 6, 2012 loan.

189.    Hellman knew that his representations about Mann's intention to pay the loan,

and the nature of Hellman's relationship with Mann were false.  Nevertheless, Hellman

continued to make these false representations to Dmitriev each time Dmitriev extended the loan

deadline, including as recently as March 5, 2018, when Mann agreed to repay the loan amount of

$1,500,000 USD by March 7, 2019.

190.    Dmitriev reasonably relied on the false representations made by Hellman because

Hellman portrayed himself to be a reputable business person and a Massachusetts attorney and

notary.

191.    Dmitriev relied on Hellman's fraudulent statements and, as a result, has been

damaged in the amount of $1,500,000 USD.

### COUNT XVII
### Civil Conspiracy

192.    The plaintiffs repeat and reallege the allegations set forth in the foregoing

paragraphs of the Complaint and hereby incorporate them by reference.

193.    Hellman entered into a common design or agreement with Mann to defraud

Russian citizens out of millions of dollars by taking out "loans" that would never be repaid.

194.    Specifically, Mann and Hellman agreed to defraud Dmitriev out of $1,500,000 USD by convincing Dmitriev to loan Mann money despite knowing that Mann would not pay it back.

195.    Specifically, Mann and Hellman agreed to falsely represent to Dmitriev that Mann owned CALLISTO MEDIA CORPORATION to encourage him to loan Mann the money when in reality Hellman owned the company.  Further, Mann and Hellman did not disclose their longstanding business relationship to Dmitriev.

196.    Hellman provided substantial assistance in furtherance of the agreement by flying from Massachusetts to Moscow, convincing Dmitriev to sign the loan agreement, and authenticating the loan documents.

## ARSENIY SHCHEPIN AND GEORGY SHCHEPIN v. MICHAEL HELLMAN

### COUNT XVIII
### Fraud

197.    The plaintiffs repeat and reallege the allegations set forth in the forgoing paragraphs of the Complaint and hereby incorporate them by reference.

198.    In June of 2016, Hellman deceived Arseniy and Georgy by representing that Choate was closing their trust because Choate did not want to do business with Russians.

199.    Hellman further deceived Arseniy and Georgy by representing that they would lose their money if they did not agree to close the trust and remove their money from the United States.

200.    Because Hellman represented that he was a Massachusetts attorney and an associate of Mann's, a long-time family friend, Arseniy and Georgy trusted Hellman's representations about Choate closing the trust.

201.    In reliance on Mann's statements about Choate closing their trust, Arseniy and Georgy signed paperwork to close the trust account and ultimately transferred $1,200,000 USD to a bank account in Russia that Mann had designated.

202.    Mann never deposited the money into a Swiss trust as he had promised.

203.    Mann has refused to return the stolen money to Arseniy and Georgy, causing them to suffer damages in the amount of $1,200,000 USD.

## COUNT XIX
## Civil Conspiracy

204.    The plaintiffs repeat and reallege the allegations set forth in the forgoing paragraphs of the Complaint and hereby incorporate them by reference.

205.    Hellman entered into a common design or agreement with Mann to defraud Arseniy and Georgy out of their trust fund assets by convincing them that Choate was closing the trust and the only way to transfer the money to a Swiss trust would be to sign the funds over to Mann personally.

206.    Specifically, Mann met with Arseniy, Georgy, and Dmitry, and Hellman by telephone and written correspondence, to mislead them into thinking that if they did not close their Choate trust account, they would lose their money.

207.    Mann reassured Arseniy and Georgy that he was acting in their best interests, and Hellman added legitimacy to the scheme by presenting the information to them as a Massachusetts attorney.

WHEREFORE, the plaintiffs respectfully request judgment against Andrei Mann and Michael Hellman as follows:

1)    In favor of plaintiffs and against the defendants on all counts;

2)      Awarding the plaintiffs money damages, plus pre-judgment and post-judgment

interest;

3)      Awarding the plaintiffs their attorneys' fees, costs and expenses in this action; and

4)      Awarding the plaintiffs such other and further relief as the court may deem just

and proper.

## DEMAND FOR JURY TRIAL

The plaintiffs hereby demand a jury trial on all claims so triable.

> PETR DMITRIEV, DARIA LATOUR,
> YUSUP OSMANOV, YURI RYAZANOV,
> ARSENIY SHCHEPIN, GEORGY
> SHCHEPIN, and OLEG SEMENETS,
>
> By their attorneys,
>
> Kenneth C. Pickering, BBO #634121
> Lauren E. Sparks, BBO #693935
> Mirick, O'Connell, DeMallie & Lougee, LLP
> 100 Front Street
> Worcester, MA 01608-1477
> Phone: (508) 791-8500
> Fax:    (508) 791-8502
> kpickering@mirickoconnell.com
> lsparks@mirickoconnell.com

Dated: June 21, 2021