UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PETR DMITRIEV, DARIA LATOUR, YUSUP OSMANOV, YURI RYAZANOV, ARSENIY SHCHEPIN, GEORGY SHCHEPIN, and OLEG SEMENETS<br>Plaintiffs<br><br>v.<br><br>ANDREI MANN and MICHAEL HELLMAN,<br>Defendants | CIVIL ACTION NO. 4:21-CV-40068 |

## PLAINTIFFS' OPPOSITION TO
## DEFENDANT ANDREI MANN'S MOTION TO DISMISS

The plaintiffs, Petr Dmitriev ("Dmitriev"), Daria Latour ("Latour"), Yusup Osmanov ("Osmanov"), Yuri Ryazanov ("Ryazanov"), Arseniy Shchepin ("Arseniy"), Georgy Shchepin ("Georgy"), and Oleg Semenets ("Semenets") (collectively, "plaintiffs"), hereby oppose the motion of the defendant, Andrei Mann ("Mann"), to dismiss the plaintiffs' complaint ("Motion").

## BACKGROUND

Mann used his family name and business contacts in Russia, with support and assistance from his business partner and co-conspirator, Michael Hellman ("Hellman"), to convince the plaintiffs to loan Mann millions of dollars under false pretenses with no intent to repay the plaintiffs. Complaint, at 1. Mann then transferred the monies out of Russia to the U.S., where Hellman and Mann are both citizens. Id. While subject to a Russian criminal investigation, Mann fled Russia for the U.S. where he remains today. Id. The Russian Federation has since

declared Mann to be a fugitive from justice and has issued a warrant for his arrest. Id.; see also Affidavit of Lauren E. Sparks, at **Exhibit 1**.

For decades, Mann presented himself to be a prominent and successful businessman in Russia from a respected family. Id. at ¶ 12. He was the primary shareholder of a seemingly profitable newspaper and publishing house, S-Info, LLC ("S-Info"), a Massachusetts company with operations in Moscow. Id. at ¶ 13. Mann used his professional reputation to convince the plaintiffs and others to loan him large sums of money, or entrust their money to him to invest. Id. at ¶ 15. In reality, Mann was not the successful businessman he held himself out to be, and never had any intention of repaying his debts to the plaintiffs. Id. at ¶ 16.

Mann's fraud on the plaintiffs took place over the course of many years. Beginning in 2010 or 2011, Mann made numerous representations to Dmitriev that he was incredibly successful, S-Info was performing well, he had become a U.S. Citizen, and he had achieved great business success in the United States. Id. at ¶ 24. Mann further represented that he regularly attracted large investments from numerous people and organizations and was always able to deliver high returns to his investors. Id. at ¶ 25. On February 6, 2012, Mann convinced Dmitriev to provide a loan to him in the amount of $1,500,000 USD and promised to repay the debt within a year. Id. at ¶ 26. Although the loan was to Mann personally, Mann represented that S-Info would pay interest on the loan. Id. at ¶ 27. Dmitriev believed that S-Info had more than enough income to pay the interest based on Mann's representations that the company was successful and that Mann owned significant real estate in Russia and the U.S. Id. at ¶¶ 27, 28. As security for the funds, Mann agreed "to provide 51 shares in the company CALLISTO MEDIA CORPORATION, allegedly registered in the United States and being the sole participant of S-info Publishing House in the Russian Federation . . . ." Id. at ¶ 29.

Mann invited Hellman to come to Moscow from Massachusetts to witness the execution of Dmitriev's loan documents and to notarize the documents with his Commonwealth of Massachusetts seal. Id. at ¶ 31. At all times relevant to this loan agreement, Hellman and Mann represented Hellman to be a neutral third party who had authority to notarize documents in Russia. Id. at ¶¶ 32, 33. Neither Hellman nor Mann disclosed to Dmitriev that Mann intended to transfer the money to his children and various business entities with no intention of ever repaying the debt. Id. at ¶ 35. Neither Hellman nor Mann disclosed to Dmitriev that Hellman was actually the owner and founder of CALLISTO MEDIA CORPORATION. Id. at ¶ 36. Neither Hellman nor Mann disclosed that they had worked together for years to create numerous business entities in Massachusetts to conceal or destroy traces of asset withdrawals from Russia. Id. at ¶ 37. To date, Mann has not repaid the loan to Dmitriev. Id. at ¶ 42.

Mann also defrauded Latour and her family. Id. at ¶¶ 43-68. Latour and her ex-husband, Dmitry Shchepin ("Dmitry") have known Mann for decades because Dmitry worked with Mann at S-Info until about 2000. Id. at ¶ 43. Latour and her family lived in Massachusetts for several years in the 1990s when Dmitry worked at S-Info's Boston location, which is where Latour met Hellman. Id. at ¶¶ 44, 45. Latour's family was very close with both Mann and Hellman, even spending holidays together. Id. at ¶ 45.

In 2001, Latour and Dmitry met with Mann at his Boston apartment to discuss creating a trust for their children, Arseniy and Georgy. Id. at ¶ 47. Mann and Hellman convinced Latour and Dmitry that they should deposit their money into a trust fund established with the Boston-based law firm, Choate Hall & Stewart LLP ("Choate"). Id. at ¶ 49. Mann volunteered to serve as trustee. Id. at ¶ 51. Based on Mann and Hellman's representations, Dmitry deposited $500,000 USD for Georgy and $500,000 USD for Arseniy. Id. at ¶ 52. Mann and Hellman

warned Dmitry and Latour that they must never contact Choate directly, and informed them that all trust communications needed to go through Hellman so that secure financial documents did not have to be sent to Russia where Dmitry and Latour then lived. Id. at ¶ 54.

Over the next several years, Mann and Hellman personally delivered purported trust-related documents to Latour and Dmitry in Russia, claiming that it was standard practice for Choate to have documents personally delivered to clients who lived outside of the United States. Id. at ¶ 55. Mann and Hellman translated all documents and communications from English into Russian, and Dmitry relied on these translations in signing paperwork and making trust-related decisions for Georgy and Arseniy. Id. at ¶ 56.

In 2016, Hellman sent Dmitry and Latour a letter in English purportedly issued by Choate stating that the trust fund needed to be closed because the amount of money invested was too insignificant. Id. at ¶ 58. Mann and Hellman explained that Choate did not want to do business with Russians and that Arseniy and Georgy would lose the money if it was not withdrawn from the trust. Id. at ¶ 60. Mann and Hellman represented that they were well-equipped to close the trust and take care of the money given their experience in the U.S. Id. at ¶ 61.

In June of 2016, based on Mann and Hellman's representations, Arseniy, Georgy, and Dmitry signed the paperwork to close the trust and transfer $1,200,000 USD from the trust to Russian bank accounts specified by Mann. Id. at ¶ 62. From there, Mann insisted that the funds be moved to a Swiss trust fund. Id. Despite repeated requests to Mann to withdraw the funds for Georgy and Arseniy, Georgy received only a small amount of his money, and Arseniy never received any. Id. at ¶ 63. Mann refused to provide proof that the funds were in a Swiss trust. Id. at ¶ 64.

Mann's fraud on the family also extends to Latour personally. Mann entered into a loan agreement with Latour on September 12, 2008. Id. at ¶ 65. Even though several extensions of the repayment deadlines had been granted, when the final repayment date came, Mann claimed that he had invested the funds in an unnamed enterprise and was unable to return them or provide any documentation of the investment. Id. at ¶¶ 66, 67. To date, Mann has not repaid Latour. Id. at ¶ 68.

Mann's fraud was not limited to his friends but also extended to his business partners. See id. at ¶¶ 69- 102. One such partner was Osmanov, who located and purchased real estate for Mann and later worked at one of Mann's companies. Id. at ¶ 70. Osmanov was aware that Mann owed many people in Russia significant debts and periodically reminded Mann of the mounting debt, but Mann always reassured Osmanov that nothing was awry. Id. at ¶ 75. Because Mann was his longtime employer and friend, Osmanov trusted Mann's representations. Id.

Over a period of years, Mann induced Osmanov to loan him money several times for what Mann described as "personal needs," always assuring Osmanov that he would repay him, even though Mann never had any intention of doing so. Id. at ¶ 76. In July of 2006, Hellman and Mann encouraged Osmanov to take out a loan in Spain, on behalf of their businesses, and guarantee the loan with property Osmanov owned in Spain. Id. at ¶ 78. Osmanov was reluctant, but Mann manipulated him into believing that this was an opportunity for all of them to invest in profitable American enterprises. Id. at ¶ 79. Eventually, Osmanov relented and on September 15, 2006, he signed a loan agreement with Hellman in the amount of $371,823 USD to loan funds to a trust created and administered by Hellman. Id. at ¶ 80. Hellman initially paid some interest on the loan, but the payments became irregular in 2014, and stopped altogether in 2017. Id. at ¶ 81.

On April 1, 2018, Mann and Osmanov summarized the debts Mann owed to Osmanov in a Loan Summary Agreement. Id. at ¶ 83. Mann acknowledged that he would owe Osmanov $6,924,866 USD and €367,500 EUR as of July 1, 2018. Id. at ¶ 84. Despite Mann's acknowledgement of the debt, these sums have never been repaid. Id. at ¶ 85.

Mann also defrauded his director of advertising at S-Info, Ryazanov. Id. at ¶¶ 86-93. On several occasions, Mann and Hellman persuaded Ryazanov to loan Mann money by describing S-Info's reliability, solvency, and high profitability. Id. at ¶ 88. Despite Mann's promises to repay the debts he owed to Ryazanov, Mann only sporadically made payments and misrepresented the status of the money and his ability to repay it. Id. at ¶ 89. For example, Mann told Ryazanov that he *was* repaying the loan but was making the payments to a U.S. bank account Mann had set up for Ryazanov. Id. Mann claimed that this money would eventually be converted into a trust fund for Ryazanov's benefit. Id. Mann never repaid Ryazanov, and the debt remains outstanding. Id. at ¶ 93.

Finally, Mann manipulated Semenets, an acquaintance, into loaning him money on three separate occasions. Id. at ¶ 98. Mann never disclosed to Semenets that he had other creditors and owed millions of dollars in unpaid debts to other people throughout Russia. Id. at ¶ 99. Rather, Mann had Hellman convince Semenets that Mann and S-Info were highly successful in the U.S. and earned as much as $10,000,000 USD in a single year. Id. at ¶ 97. Mann explained that he needed to borrow money from Semenets to fund the software development of one of his new ventures which promised to be as successful as S-Info. Id. at ¶ 96. As with the other plaintiffs, Mann never repaid Semenets. In 2019, Mann agreed to meet Semenets in Spain to execute an agreement in which Mann again promised to repay his debts to Semenets and the other plaintiffs. Id. at ¶ 100. Despite this agreement, Mann still has not repaid Semenets.

The plaintiffs assert claims of fraud, conspiracy, conversion, unjust enrichment, and breaches of contracts.

## ARGUMENT[1]

### I. The Plaintiffs' Claims Are Sufficiently Pled

In Sections L and M of his brief Mann argues that the plaintiffs' fraud and civil conspiracy claims are not sufficiently pled and lack the specificity required under Fed. R. Civ. P. 9(b). To the contrary, as evidenced by the lengthy and detailed Complaint and its supporting documentation, the plaintiffs have gone far beyond what is required at the pleading stage.

**A. Legal Standard**

When ruling on a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6),[2] the court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all reasonable inferences. See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999). Dismissal is only appropriate if the pleadings, so viewed, fail to support "a plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "In considering the merits of a motion to dismiss, the court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken." Nollet v. Justices of the Trial Court of Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000) aff'd, 248 F.3d 1127 (1st Cir. 2000). If the facts in the complaint are sufficient to state a

---

[1] As an initial matter, the plaintiffs note that Mann's Motion is procedurally defective in that he did not include a Local Rule 7.1 certification or confer with plaintiffs' counsel prior to filing the Motion. Mann's counsel eventually reached out to defendants' counsel after filing his motion.

[2] Mann cites to the legal standard applicable to motions to dismiss pursuant to Fed R. Civ. P. 12(b)(6), but he ultimately argues that the complaint fails to satisfy the pleading requirements of Fed. R. Civ. P. 9(b). The plaintiffs submit that their complaint survives under either standard.

cause of action, a motion to dismiss the complaint must be denied. See Declude, Inc. v. Perry, 593 F. Supp. 2d 290, 294 (D. Mass. 2008).

In addition, "[t]o establish a claim for fraud under Massachusetts law, a plaintiff must prove that the defendant made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage." Taylor v. Am. Chemistry Council, 576 F.3d 16, 31 (1st Cir. 2009) (internal quotation marks omitted). Pursuant to Fed. R. Civ. P. 9(b), allegations of fraud must meet a heightened pleading standard. Thus, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "This heightened pleading standard is satisfied by an averment of the who, what, where, and when of the allegedly false or fraudulent representation." Rodi v. S.N.E. Sch. of Law, 389 F.3d 5, 15 (1st Cir. 2004) (internal quotation marks omitted). The other elements of fraud, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally;" Fed. R. Civ. P. 9(b); however, the complaint must identify "the basis for inferring scienter." N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009). "The Courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 358 (1st Cir. 2013) (quoting Cardinale, 567 F.3d at 13) (additional citations omitted).

The purpose of that standard is three-fold: (1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a "strike suit;" and (3) to safeguard defendants from

frivolous charges which might damage their reputations. New England Data Servs., Inc. v. Becher, 829 F.2d 286, 289 (1st Cir. 1987).

### B. The Plaintiffs' Fraud Claims Meet The Heightened Pleading Standard Required by Fed. R. Civ. P. 9(b)

The fraud and civil conspiracy claims that sound in fraud alleged in the complaint more than satisfy the heightened pleading standard. Mann's misrepresentations to each plaintiff are described in detail, including the locations and times such misrepresentations were made. The plaintiffs appended loan agreements, and the certified translations of those agreements, further establish the details of Mann's extensive fraudulent endeavors.

Mann argues that the fraud claims should be dismissed by way of example, pointing to the factual allegations within Count X involving Georgy and Arseniy. Mann states that such counts are "as vague as it gets" because the complaint does not include the dates of or witnesses to Mann's statements that "Choate was closing their trust because Choate did not want to do business with Russians," and that "if they transferred the money to their Russian bank accounts and then to a different account, Mann would deposit the funds into a Swiss trust." Compl., at ¶¶ 156, 157. That might be true if one only looked to the factual allegations in paragraphs 156 and 157. The plaintiffs concede these two paragraphs alone are probably not sufficient to meet the pleading standard required by Fed. R. Civ. P. 9(b); which is why this count of fraud is alleged with much greater particularity earlier in the complaint. See id. at ¶¶ 58-64 (alleging that Mann made these representations in conversation with Arseniy, Georgy, Dmitry, and Hellman in 2016 resulting in Arseniy and Georgy's withdrawal of their trust funds and such funds' subsequent transfer to Mann in June of 2016). The additional context provided by this earlier section of the complaint fills in the purported gaps about which Mann appears to complain, particularly when

one examines the exhibits attached to the complaint which establish the facts of the loans, including the amount, date and parties involved.

The complaint is also pled consistently with the purpose of Rule 9(b), which is to enable a defendant to meaningfully respond to allegations of fraud and to prevent a plaintiff from using a fraud claim to discover additional wrongdoing. Clearly, Mann was able to meaningfully, if not persuasively, respond to the complaint, as is evidenced by the 136 page declaration he signed and attached to his Motion. It is also apparent from the nature of the claims that the plaintiffs are alleging discrete and specific instances of fraudulent conduct and are not seeking to use this litigation to uncover additional wrongdoing. Accordingly, the plaintiffs' fraud claims should survive Mann's Motion.

## II. Mann Has Not Met His Burden Under the Doctrine of Forum Non Conveniens

In Sections H and I of his brief Mann suggests that the court should dismiss the complaint on the basis of forum non conveniens because the loan documents attached to the complaint do not contain a choice of law provisions specifying that American law governs or that the U.S. is the appropriate forum. This argument conflates a question about choice of law[3]—which is not in itself a ground for dismissal—with an analysis under the doctrine of forum non conveniens.

### A. Legal Standard

The Supreme Court maintains that a "plaintiff's choice of forum should rarely be disturbed." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947); Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 (1981). "The doctrine of forum non conveniens . . . permits a court to dismiss a case because the chosen forum (despite the presence of jurisdiction and venue) is so

---

[3] Federal courts sitting diversity routinely apply the law of other jurisdictions, including substantive state and foreign law. Mann's argument that the case should be heard in Russia merely because it may involve the application of Russian law is without merit.

inconvenient that it would be unfair to conduct the litigation in that place." Howe v. Goldcorp Invs., Ltd., 946 F.2d 944, 947 (1st Cir. 1991). "The practical effect of a dismissal on these grounds is to require the plaintiff to file his complaint in a more convenient forum elsewhere in order to obtain relief. Nandjou v. Marriott Int'l, Inc., 985 F.3d 135, 140 (1st Cir. 2021).

Because the doctrine of forum non conveniens permits a federal district court to deprive a plaintiff of availing himself of his chosen forum even when he otherwise would be legally entitled to bring suit in it, "the bar for a district court to dismiss a suit pursuant to the doctrine is a high one." Id. The doctrine "is intended to avoid trials in places so inconvenient that transfer is needed to avoid *serious unfairness*." Adelson v. Hananel, 510 F.3d 43, 52 (1st Cir. 2007) (emphasis added) (internal quotation marks omitted).

"The first step of the requisite inquiry under the doctrine entails consideration of whether an adequate alternative forum exists to the one that the plaintiff has chosen for her suit." Iragorri v. Int'l Elevator, Inc., 203 F.3d 8, 12 (1st Cir. 2000). If there is no adequate alternative forum, then there is no basis for dismissal under the doctrine and thus no need to reach the second step. See id. In the event that there is an adequate alternative forum available, however, a court must weigh at the second step of the inquiry what are known as the public interest factors (such as the relative interests of the local forum and the government with jurisdiction over the alternative forum) and the private interest factors (such as the burdensomeness to the parties and witnesses of having the case proceed in either of the available fora). Id.

To establish the basis for dismissing a case based on forum non conveniens, a defendant bears a "heavy burden;" Adelson, 510 F.3d at 52; and must show that the assessment of the relevant public and private interests favors the case being litigated in the foreign forum to such a

degree that it suffices to overcome the presumption that the plaintiff is entitled to bring his case in his chosen forum. See Iragorri, 203 F.3d at 15. Here, Mann falls far short of meeting this burden.

### B. Massachusetts District Court is the Correct Forum

Mann did not undertake the prescribed forum non conveniens analysis delineated above, but even if he had, he would not have been able to show that there is an adequate alternative forum in which the plaintiffs can seek relief. His argument that Russia is the appropriate forum and that such forum is more convenient is entirely disingenuous. Such a forum is impracticable. Mann is a fugitive in Russia, wanted by the Russian authorities in connection with his criminal conduct. See Exhibit 1. Requiring the plaintiffs to file suit in Russia would effectively deny the plaintiffs any chance they have of relief, unless Mann—a U.S. citizen—decides to submit himself to the jurisdiction of Russian courts and turn himself in. It is difficult to conceive of a more inconvenient forum for Mann, who lives in Brooklyn and faces certain prosecution if he ever returns to Russia.

Further, and as is apparent from the bankruptcy proceeding against Mann in Russia, Mann has few if any assets in Russia. (The effect of the Russian bankruptcy action is discussed infra.) The complaint specifically alleges that Mann transferred the funds he converted from the plaintiffs to accounts in the U.S. A judgment issued by a Russian court would be essentially meaningless to the plaintiffs. Accordingly, Russia is not an acceptable or adequate alternative forum.

The absence of an adequate alternative forum should end this inquiry in the plaintiffs' favor. If the court is inclined to go further in the forum non conveniens analysis, however, the result is the same because the private and public interest factors weigh in favor of a U.S. forum.

An assessment of the private interest factors considers the burdensomeness to the parties and witnesses of having the case proceed in the plaintiffs' chosen forum or the alternative forum proposed by the defendants. Here, the plaintiffs are located in Russia and Israel. Hellman is domiciled in Massachusetts. Mann is domiciled in New York, but has apparently adopted a Massachusetts address "for the purposes of this action… for security reasons." Mann's Declaration, at ¶ 2. Russia would be a less burdensome forum for the plaintiffs *if* it offered a plausible route to relief, but it does not given Mann's fugitive status. The plaintiffs have chosen to waive any inconvenience or burden by filing suit in the U.S. To the extent that the plaintiffs determine that there are witnesses located in Russia that will help support their case, the plaintiffs will have to contend with how to arrange for those witnesses to testify in the U.S. at a trial of this matter. The risk that such witnesses will not testify due to inconvenience is one that is born solely by the plaintiffs as the parties with the burden of proof. Mann has named no potential witnesses in Russia that he would seek to call in his defense of this matter. The burden of traveling to Russia for any U.S.-based witnesses, including Mann and Hellman themselves, lawyers and trustees at Choate, and individuals affiliated with S-Info's Boston location, would be substantial if not wholly insurmountable. In sum, the plaintiffs accept that a Massachusetts forum may not be convenient for them or some of their witnesses, but they initiated this litigation and are willing to submit to this burden. The U.S. District Court is the only forum with jurisdiction over both Hellman and Mann – particularly where Mann is a fugitive from Russian authorities.

An assessment of the public interest factors, which include the relative interests of the local forum and the government with jurisdiction over the alternative forum, is of neutral weight and is therefore "indeterminant." See Nandjou, 985 F.3d at 140. Russia certainly has an interest

in the resolution of a dispute that has caused its citizens to lose millions of dollars. The U.S., however, has an equally compelling interest in ensuring that U.S. citizens who have committed large scale fraud and concealed millions of dollars of ill-gotten funds in U.S. banking and investment networks are apprehended and held accountable, especially when one of those citizens, Hellman, used his clout as a Massachusetts notary and attorney to add an air of legitimacy to the fraud perpetrated on unwitting foreign nationals.

Mann has not met his burden of demonstrating that Russia is an appropriate alternative forum. As such, the plaintiffs' choice of forum should not be disturbed. See Gulf Oil Corp. v. Gilbert, 330 U.S. at 508.

### III. Fed. R. Civ. P. 19 Analysis / Joinder of Indispensable Parties

In Sections C, D, and E of his brief Mann argues that the complaint does not comport with Fed. R. Civ. P. 19 because it identifies, without naming as parties, four of Mann and Hellman's business entities. Specifically, Mann contends that: S-Info LLC is an indispensable party because interest on Dmitriev's loan was to be paid by S-Info LLC; OOO-S-Info, the Russian parent company to S-Info LLC, is an indispensable party because Dmitriev worked for and received a salary from the company; CALLISTO MEDIA CORPORATION is an indispensable party because Mann secured Dmitriev's loan with 51 shares in the company; and First Crandull Construction, Inc. because it "can still be sued, as it was dissolved only on June 28, 2019." Memorandum In Support of Motion, at 7. Mann argues that, pursuant to Fed. R. Civ. P. 12(b)(7), which allows a party to move for dismissal of an action for failure to join a party under Rule 18, the complaint should be dismissed for failing to name these entities as parties.

**A. Legal Standard**

Rule 19 is geared toward circumstances "where a lawsuit is proceeding without a party whose interests are central to the suit." Bacardi Int'l Ltd. v. V. Suárez & Co., 719 F.3d 1, 9 (1st Cir. 2013). Such a party must be joined when feasible. Fed. R. Civ. P. 19(a). When joinder is not possible, the court must determine whether the action should proceed among the existing parties or be dismissed. Fed. R. Civ. P. 19(b). Rule 19 "calls for courts to make pragmatic, practical judgments that are heavily influenced by the facts of each case." Bacardi, 719 F.3d at 9; see also Pujol v. Shearson/Am. Express, Inc., 877 F.2d 132, 134 (1st Cir. 1989) (Breyer, J.) (explaining that Rule 19(a) requires courts to "decide whether considerations of efficiency and fairness, growing out of the particular circumstances of the case, require that a particular person be joined as a party").

A person is a "required party" who must be joined under Rule 19(a) if "in that person's absence, the court cannot accord complete relief among existing parties," or if

> that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1)(A)-(B). The business entities satisfy none of these criteria.

### B. The Business Entities Are Not Required Parties

First, even in the business entities' absence, the court can accord complete relief among the existing parties. Tellingly, Mann has not plausibly asserted that relief is not possible without the joinder of these entities. None of the business entities are named as

signatories to any of the loan documents. Mann signed each agreement at issue in his personal capacity, not on behalf of any of the entities mentioned in his Motion.[4]

Second, even assuming that any of these business entities can claim an interest in the outcome of this dispute despite the fact that they are not signatories to the loan documents, proceeding in their absence does not "as a practical matter impair or impede" the entities' ability to protect that interest. Fed. R. Civ. P. 19(a)(1)(B)(i). "When the interests of an absent party are aligned closely enough with the interests of an existing party, and where the existing party pursues those interests in the court of litigation, the absent party is not required under Rule 19." See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden, No. 20-1942, 2021 WL 3782129, at *2 (1st Cir. Aug. 26, 2021). Mann and Hellman are the sole founders, shareholders and/or owners of the business entities listed. They *are* the business entities. To the extent that the entities have any interest in the outcome of this litigation (which no party has alleged), this interest is essentially identical to Mann and Hellman's. The mere mention of an individual or entity within a complaint does not render it a required party pursuant to Rule 19.

Third, there is no risk that failure to join the business entities will result in the entities' bearing multiple or inconsistent obligations. See Bacardi, 719 F.3d at 13 (holding no joinder necessary where "risk of inconsistency may be theoretically possible, but is not a practical concern"). In his Motion, Mann develops no basis for contending that the entities would face any such risk. If the business entities could reasonably share in the liability for the fraud that Mann and Hellman committed, the plaintiffs would have included them in this action in the first instance. Mann and Hellman, however, acted in

---

[4] Hellman signed one document on behalf of Lake Louise Revocable Trust II. However, Mann does not argue that Lake Louise Revocable Trust II is a necessary party.

their individual capacities, using Mann's perceived business successes, to defraud the plaintiffs. Mann's request for dismissal pursuant to Fed. R. Civ. P. 12(b)(7) should therefore be denied.

## IV. Judicial Proceedings in Russia

In Sections F and G Mann argues that plaintiffs failed to disclose ongoing judicial proceedings in the Moscow Arbitration Court, and that this Court could apply collateral estoppel "for the purposes of forum non-conveniens."

### A. Legal Standard

Massachusetts law governs the determination as to whether a judicial decision from the Russian Federation is recognized in this action because the complaint was filed pursuant to the court's diversity jurisdiction. Sangiovanni Hernandez v. Dominicana de Aviacion, C. Por A., 556 F.2d 611 (1st Cir. 1977) (holding that "the issue of whether a foreign judgment will be enforced by a federal court having jurisdiction by means of diversity of citizenship is governed by the laws of the state where the federal court is located").

Massachusetts adopted the 2005 Model Act, also known as the Uniform Foreign Country Money Judgments Recognition Act (the "Act"). See M.G.L. c. 235, § 23A. Under the Act there are several circumstances where a foreign judgment will not be given conclusive effect; including where judgments of [the Commonwealth of Massachusetts] are not recognized in the courts of the foreign state." Id.

### B. Massachusetts Does Not Recognize Russian Federation Judicial Decisions

As Mann acknowledges in his brief, "Massachusetts does not recognize foreign country judgments without reciprocity." Mann's Memo. at 8. Russia does not recognize foreign judgments unless an international treaty has been signed between Russia and the judgment-

rendering country. See Russian Arbitral Procedure Code, Article 241; Russian Code of Civil Procedure, Article 409. Russia does not have a treaty or other agreement concerning the recognition and enforcement of foreign judgments stemming from the United States, or for that matter Massachusetts. As such, Massachusetts does not recognize Russian Federation judicial decisions and this Court cannot rely on such decisions for the purposes of collateral estoppel. Further, the Russian bankruptcy action – which is proceeding with Mann in abstentia due to his fugitive status – is ongoing and therefore is not a final judgment on the merits as required for collateral estoppel.

## V.     "Lumping"

In Sections J and K of his brief Mann argues that the plaintiffs' complaint is defective because the complaint lumps together unrelated claims, and that the claims should be severed pursuant to Fed. R. Civ. P. 21.

### A. Legal Standard

"Misjoinder of parties is not a ground for dismissing an action." Fed. R. Civ. P. 21. The court has discretion to add or drop a party on a motion or on its own, at any time, on just terms. Id. "The court may also sever any claims against a party." Id. "The decision to separate parties or claims is a case management determination peculiarly within the discretion of the trial court." Acevedo-Garcia v. Monroig, 351 F.3d 547, 558 (1st Cir. 2003) (citations omitted; internal quotation marks omitted). In deciding whether severing a claim is appropriate, the court considers "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate

claims." Katz v. Spiniello Companies, No. CV 16-11380, 2016 WL 7209662, at *6 (D. Mass. Dec. 12, 2016) (internal quotation marks omitted).

### B. The Claims Have Appropriately Been Brought In a Single Complaint

Mann cites to no legal authority to support his argument that the complaint is defective because it "lumps together" unrelated claims. In fact, the claims in the complaint are based on the same series of occurrences that took place in Moscow over decades among a group of friends and business associates. All the claims allege that Mann, using his carefully cultivated image as a successful businessman, wove an intricate web of deception to convince people who trusted and respected him to loan him exorbitant amounts of money that he never intended to pay back. When certain plaintiffs asked questions of Mann or raised concerns about his ability to repay, Mann pointed out that he had successfully invested money for the co-plaintiffs in an effort to conceal his fraud.

Further, the claims as to each plaintiff raise identical questions of law (each plaintiff has brought the same claims against Mann) and similar issues of fact (resolution will require a meticulous review of Mann's financial records and bank statements from the same time period for all of the plaintiffs). Given the complex nature of the case, judicial economy is facilitated by listing the plaintiffs' claims in a single complaint, particularly where discovery for the various issues surrounding that process will be overlapping. Judicial resources will be best conserved by trying all of these related claims in a single forum and proceeding.

Mann vaguely argues that trying the claims together will cause him prejudice, but he has not made any showing to that effect. The plaintiffs, on the contrary, would be prejudiced if forced to try their claims separately. To prove the allegations in the complaint, the plaintiffs will need similar discovery and require many of the same witnesses (most of whom are international)

to testify. The documentary evidence relevant to each specific claim may be different, but documents regarding Mann's financial status over the years will be critical to all of the claims. Accordingly, the motion to sever should be denied.

## CONCLUSION

For the foregoing reasons, the plaintiffs request that this court deny defendant Andrei Mann's Motion to Dismiss.

> PETR DMITRIEV, DARIA LATOUR, YUSUP OSMANOV, YURI RYAZANOV, ARSENIY SHCHEPIN, GEORGY SHCHEPIN, and OLEG SEMENETS,
>
> By their attorneys,
>
> /s/ Lauren E. Sparks
> _____
> Kenneth C. Pickering, BBO #634121
> Lauren E. Sparks, BBO #693935
> Mirick, O'Connell, DeMallie & Lougee, LLP
> 100 Front Street
> Worcester, MA 01608-1477
> Phone: (508) 791-8500
> Fax:   (508) 791-8502
> kpickering@mirickoconnell.com
> lsparks@mirickoconnell.com

Dated: September 2, 2021

## CERTIFICATE OF SERVICE

I, Lauren E. Sparks, hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 2, 2021

> /s/ Lauren E. Sparks
> _____
> Lauren E. Sparks