UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PETR DMITRIEV, DARIA LATOUR,
YUSUP OSMANOV, YURI RYAZANOV,
ARSENIY SHCHEPIN, GEORGY
SHCHEPIN, and OLEG SEMENETS
    Plaintiffs

v.

ANDREI MANN and MICHAEL HELLMAN,
    Defendants

CIVIL ACTION NO. 4:21-CV-40068

## PLAINTIFFS' OPPOSITION TO
## DEFENDANT MICHAEL HELLMAN'S MOTION TO DISMISS

The plaintiffs, Petr Dmitriev ("Dmitriev"), Daria Latour ("Latour"), Yusup Osmanov ("Osmanov"), Yuri Ryazanov ("Ryazanov"), Arseniy Shchepin ("Arseniy"), Georgy Shchepin ("Georgy"), and Oleg Semenets ("Semenets") (collectively, "plaintiffs"), hereby oppose the motion of the defendant, Michael Hellman ("Hellman"), to dismiss the plaintiffs' Complaint ("Motion").

## BACKGROUND

Hellman provided support and assistance to his business partner and co-conspirator, defendant Andrei Mann ("Mann"), to convince the plaintiffs to loan Mann millions of dollars under false pretenses with no intent to repay the plaintiffs. Complaint, at 1. Mann then transferred the monies out of Russia to the U.S., where Hellman and Mann are both residents and U.S. citizens. Id. The Russian Federation has declared Mann to be a fugitive from justice and has issued a warrant for his arrest. Id.; see also Affidavit of Lauren E. Sparks, at **Exhibit 1**. While subject to the Russian criminal investigation, Mann fled Russia for the U.S. where he

remains today. Id. The Complaint alleges counts for fraud and civil conspiracy against Hellman on behalf of Dmitriev (Counts XVI and XVII), and Arseniy and Georgy Shchepin (Counts XVIII and XIX).

Hellman, a Massachusetts notary, resides in Newton, Massachusetts. Id. at ¶ 9. Hellman and Mann are business partners. See id. at ¶ 18. Hellman and Mann worked together to create numerous business entities in Massachusetts – including S-Info, LLC ("S-Info"), a Massachusetts company with seemingly profitable newspaper and publishing operations in Moscow – to receive funds from Mann's unwitting lenders and investors. Id. at 13, 18. Using the entities that Hellman helped him to establish, Mann funneled money from the plaintiffs to Mann's personal accounts and the accounts of his children. Id. at ¶ 19.

On February 6, 2012, Mann persuaded Dmitriev—after years of posturing that he was incredibly successful in Russia and the U.S., regularly attracted large investments, and delivered high returns—to provide a loan to him in the amount of $1,500,000 USD. Id. at ¶¶ 24-26. Hellman assisted Mann by communicating with the plaintiffs at various times to reassure them that Mann would repay his debts and that everything was proceeding normally. Id. at ¶ 21. Hellman traveled from Massachusetts to Moscow to assist Mann and witness the execution of the loan documents. Id. at ¶ 31. Hellman held himself out to be a neutral third party and executed an Apostille with a Commonwealth of Massachusetts seal to notarize the loan documents. Id. at ¶¶ 31, 32. Hellman further represented to Dmitriev that he had the authority to notarize documents in Russia. Id. at ¶ 33. Mann requested that Dmitriev's loan be paid to him in cash. Id. at ¶ 34. Neither Hellman nor Mann disclosed to Dmitriev that Mann wanted the funds in cash so that Mann would be able to present the money as his own and conceal the source of the funds when

transferring the ill-gotten money to his children and the business entities he and Hellman created. Id. at ¶ 35.

To secure Dmitriev's loan, Mann agreed "to provide 51 shares in the company CALLISTO MEDIA CORPORATION, allegedly registered in the United States and being the sole participant of S-info Publishing House in the Russian Federation . . . ." Id. at ¶ 29. Hellman did not disclose to Dmitriev that Hellman, not Mann, was the owner and founder of CALLISTO MEDIA CORPORATION. Id. at ¶ 36. Hellman also failed to disclose that he and Mann worked together for years to create numerous business entities in Massachusetts to conceal or destroy traces of asset withdrawals from Russia. Id. at ¶ 37. Dmitriev's loan was extended six times. Id. at ¶ 38. Each time Hellman personally flew to Russia to "notarize" the agreements and provide a false air of legitimacy to the deals. Id. at ¶ 40. Hellman misled Dmitriev into believing that he could rely on Hellman as a Massachusetts notary and neutral third party, and repeatedly reassured Dmitriev that Mann would pay his debts. Id. The $1,500,000 USD loan remains outstanding. Id. at ¶ 41.

Hellman also helped Mann to defraud the Latour/Shchepin Family. See id. at ¶¶ 43-68. Latour had known Mann for several years and believed him to be a successful businessman. Id. at ¶ 43. Indeed, Latour's ex-husband, Dmitry Shchepin ("Dmitry"), worked closely with Mann at S-Info for years, where Mann was the general director and primary shareholder. Id. Latour, Dmitry, Georgy, and Arseniy lived in Massachusetts in the 1990s during which time they met Hellman, who Mann acknowledged as his business partner and a representative of S-Info's Boston location. Id. at ¶ 44. Latour's family was very close with both Hellman and Mann, even spending holidays together. Id. at ¶ 45.

In 2001, Latour and Dmitry met with Hellman and Mann in Boston to discuss creating a trust for their two sons, Georgy and Arseniy, where Hellman explained the details of creating a trust. Id. at ¶¶ 47, 48. Hellman and Mann convinced Latour and Dmitry to invest their money in a trust fund established by the Boston-based law firm, Choate Hall & Stewart LLP ("Choate"). Id. at ¶ 49. Hellman claimed to have a relationship with Choate and endeavored to handle the legal aspects of the trust and depositing the money. Id. at ¶ 50. Based on Mann and Hellman's representations, Dmitry deposited into a trust $500,000 USD for Georgy and $500,000 USD for Arseniy. Id. at ¶ 52. Latour and Dmitry executed the trust instruments at Choate's Boston office but did not have any further interaction with Choate. Id. at ¶ 53. Hellman warned Dmitry and Latour that they should never contact Choate directly, and informed them that all trust communications needed to go through *him* to make sure that secure financial documents did not have to be sent to Russia, where Dmitry and Latour had moved. Id. at ¶ 54.

Over the next several years, both Hellman and Mann provided purported trust-related documents to Latour and Dmitry in Russia, claiming that it was standard practice for Choate to have documents personally delivered to clients who lived outside the U.S. Id. at ¶ 55. Hellman and Mann translated all documents and communications from English to Russian, and Dmitry relied on these translations in signing paperwork and making trust-related decisions on behalf of his sons. Id. at ¶ 56.

In 2016, Hellman sent Dmitry and Latour a letter purportedly issued by Choate. Id. at ¶ 58. The letter stated that the trust fund needed to be closed because the amount of money invested was too insignificant. Id. This communication was startling to Dmitry and Latour because Mann had repeatedly cautioned them never to transfer funds from the trust to Russia. Id. at ¶ 59. Hellman and Mann explained that Choate did not want to do business with Russians and

that Arseniy and Georgy would lose their funds if the money was not withdrawn from the Choate trust. Id. at ¶ 60. Hellman and Mann assured Arseniy, Georgy, Dmitry, and Latour that they were equipped to handle the work of closing the trust given their experience in the U.S. Id. at ¶ 61. Accordingly, in June of 2016, Arseniy, Georgy, and Dmitry signed paperwork to close the trust and transfer approximately $1,200,000 USD from the trust to bank accounts specified by Mann. Id. at ¶ 62. The funds were not held in trust and were never returned to Arseniy and Georgy. Id. at ¶ 64.

Hellman also helped Mann defraud Osmanov, Mann's longtime business associate and the head of one of Mann's Moscow companies. Id. at ¶¶ 69-85. In July of 2006, Hellman and Mann represented to Osmanov that they needed a loan so that they could invest money in several of their U.S.-based projects. Id. at ¶ 77. They encouraged Osmanov to take out a loan in the amount of $371,823 USD and pay the funds to a trust created and administered by Hellman. Id. at ¶ 80. Initially, Hellman paid interest on the loan but has stopped paying entirely as of 2017. Id. at ¶ 81. Osmanov has been unable to reach Hellman since that time and the debt remains outstanding. Id. at ¶ 82.

Similarly, Hellman and Mann conspired to defraud Ryazanov, another of Mann's business associates from S-Info. Id. at ¶¶ 86-93. Specifically, Hellman convinced Ryazanov into loaning Mann money in April 2008 by misleading him about S-Info's reliability, solvency, and profitability. Id. at ¶ 88. Mann represented that instead of repaying the debt to Ryazanov directly, he was setting the money aside in a U.S. bank account so that he and Hellman could set up a U.S. trust fund for Ryazanov's benefit. Id. at ¶ 89. Hellman repeatedly reassured Ryazanov that Mann would establish such a trust and pointed to Mann and Hellman's allegedly successful establishment and administration of Georgy and Arseniy's trust fund. Id. at ¶ 90. In fact, the

funds Ryazanov loaned to Mann were never repaid, and the debt remains outstanding. Id. at ¶ 93.

Finally, Hellman conspired with Mann to convert money from Semenets, Mann's acquaintance from the University of Moscow State University. Id. at ¶¶ 94-102. From Massachusetts, Hellman had telephone discussions with Semenets in which he falsely reported information about S-Info's earnings to induce Semenets to loan Mann money. Id. at ¶ 97. Based in part on these representations and without knowing that Mann had other creditors and owed millions of dollars to the plaintiffs and others in Russia, Semenets loaned Mann money on three occasions. Id. at ¶ 98. The loans have never been repaid. Id. at ¶ 102.

The plaintiffs have asserted four claims against Hellman, including two counts of civil conspiracy and two counts of fraud.[1]

## LEGAL STANDARD

When ruling on a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6),[2] the court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all reasonable inferences. See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999). Dismissal is only appropriate if the pleadings, so viewed, fail to support "a plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "In considering the merits of a motion to dismiss, the court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be

---

[1] Hellman's Motion mistakenly states that the plaintiffs have brought six claims against Hellman.

[2] Mann cites to the legal standard applicable to motions to dismiss pursuant to Fed R. Civ. P. 12(b)(6), but he ultimately argues that the complaint fails to satisfy the pleading requirements of Fed. R. Civ. P. 9(b). The plaintiffs submit that their complaint survives under either standard.

taken." Nollet v. Justices of the Trial Court of Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000) aff'd, 248 F.3d 1127 (1st Cir. 2000). If the facts in the complaint are sufficient to state a cause of action, a motion to dismiss the complaint must be denied. See Declude, Inc. v. Perry, 593 F. Supp. 2d 290, 294 (D. Mass. 2008).

In addition, "[t]o establish a claim for fraud under Massachusetts law, a plaintiff must prove that the defendant made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage." Taylor v. Am. Chemistry Council, 576 F.3d 16, 31 (1st Cir. 2009) (internal quotation marks omitted). Pursuant to Fed. R. Civ. P. 9(b), allegations of fraud must meet a heightened pleading standard. Thus, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "This heightened pleading standard is satisfied by an averment of the who, what, where, and when of the allegedly false or fraudulent representation." Rodi v. S.N.E. Sch. of Law, 389 F.3d 5, 15 (1st Cir. 2004) (internal quotation marks omitted). The other elements of fraud, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally;" Fed. R. Civ. P. 9(b); however, the complaint must identify "the basis for inferring scienter." N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009). "The Courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 358 (1st Cir. 2013) (quoting Cardinale, 567 F.3d at 13) (additional citations omitted).

The purpose of the pleading standard is three-fold: (1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a "strike suit;" and (3) to safeguard defendants from frivolous charges which might damage their reputations. New England Data Servs., Inc. v. Becher, 829 F.2d 286, 289 (1st Cir. 1987).

## ARGUMENT[3]

Hellman argues that the plaintiffs' fraud and civil conspiracy claims are not sufficiently pled and lack the specificity required by Fed. R. Civ. P. 9(b). To the contrary, and as evidenced by the lengthy and detailed Complaint and its supporting documentation, the plaintiffs have gone far beyond what is required at the pleading stage.

### A. Dmitriev's Allegations of Fraud and Civil Conspiracy Meet the Pleading Requirements established by Fed. R. Civ. P. 9(b).

The complaint plainly alleges the "the who, what, where, and when" of the fraudulent representations Hellman made to Mann. See Consumer Financial Protection Bureau v. Commonwealth Equity Group, No. 20-CV-10991, 2021 WL 3516690 (D. Mass. Aug. 10, 2021).

On February 6, 2012 (when), Hellman aided Mann in convincing Dmitriev (who) to loan him $1,500,000 in Moscow (where). In doing so, Hellman fraudulently represented himself to be a neutral third party despite his ownership interest in CALLISTO MEDIA CORPORATION (what). Hellman failed to disclose that he and Mann had a long-standing relationship in which they conspired to create Massachusetts-based business entities to assist Mann in concealing or destroying traces of asset withdrawals from Russia (what). Hellman failed to disclose to Dmitriev that Mann planned to transfer Dmitriev's loans to his children and business entities and

---

[3] As an initial matter, the plaintiffs note that Hellman's Motion is procedurally defective in that he did not include a Local Rule 7.1 certification or confer with plaintiffs' counsel prior to filing the Motion.

had no intention of ever repaying the loan (what). Hellman further reassured Dmitriev that Mann would be able to repay the loan (what).

Hellman argues that the complaint is inadequate because (1) there is no allegation that explains the materiality of Hellman's failure to disclose his ownership interest in CALLISTO MEDIA CORPORATION; (2) it fails to establish Dmitriev's reliance on Mann's statements; (3) Hellman's statements are non-actionable puffery; and (4) there are no allegations that Hellman had motive to help Mann defraud Dmitriev. These arguments fail because the complaint has satisfied the pleading requirements by setting forth detailed allegations about the nature of Hellman's nefarious conduct. First, Hellman concealed the nature of his relationship with Mann from Dmitriev and presented himself as a neutral party. Had Dmitriev realized that Hellman was Mann's long-time business partner, co-conspirator and enabler, he would not have relied on Hellman's representations about the loan and Mann's ability to repay his debt when agreeing to loan Mann the money. Had Dmitriev known that the very entity that was being used to secure the loan—CALLISTO MEDIA CORPORATION—was actually owned and founded by Hellman, it would have been readily apparent that the connection between Hellman and Mann was much more intimate than he was led to believe, raising a number of questions about the transaction, the twisted web of entities the two created together, and Mann's true financial condition.

Next, as the complaint makes clear, Dmitriev relied on Hellman's misrepresentations in agreeing to the loan. Dmitriev trusted Hellman, a notary, and citizen of the U.S., Hellman's status and neutrality added an air of legality to the transaction that caused Dmitriev to feel comfortable making such a large loan to Mann. When Hellman, a professional, endorsed Mann's ability to repay the loan and acted as a notary for the transaction, Dmitriev was lulled

into the mistaken belief that the deal was legitimate when in fact Mann and Hellman were acting in concert and knew the funds would not be repaid.

Hellman's argument that his statements were "non-actionable puffery" pursuant to Costa v. FCA US LLC, No. 20-CV-11810-ADB, 2021 WL 2338963 (D. Mass. June 8, 2021) are misplaced. In Costa, a car owner and his wife were injured when a safety mechanism in the car's headrests unexpectedly deployed. Id. at *1. The couple brought a fraud claim against the manufacturer. Id. The purported fraud was rooted in statements about the car's safety on the manufacturer's website. Id. at *11. The court granted the manufacturer's motion to dismiss because the manufacturer's advertisements about safety were generalized and vague, and therefore constituted puffery. Id. at *12. In contrast, Hellman's statements to Dmitriev were targeted to Dmitiev directly and intended to induce Dmitriev to agree to the loan. Hellman *specifically vouched* for Mann's ability to repay his debts. These statements are distinguishable from those of a manufacturer's advertisements on a website designed to attract car buyers. Here, the transaction itself was fraudulent and all of Hellman's statements were intended to conceal that fact from Dmitriev.

Hellman also suggests that the complaint is deficient because it does not offer a reasonable motive for Hellman to participate in the fraud as a co-conspirator. Indeed, Hellman's motive is not readily ascertained from his statements or the loan documents he helped to execute. The plaintiffs expect that discovery will reveal that Hellman had a financial motive to assist Mann in perpetrating his fraud against the plaintiffs. Motive, however, is not an element of fraud; see Taylor v. Am. Chemistry Council, 576 F.3d at 31; or conspiracy; see Correia v. Framingham, 969 F. Supp. 2d 89 (D. Mass. Sept. 3, 2013); and therefore need not be alleged for a complaint to survive a motion to dismiss.

### B. The Shchepins' Allegations of Fraud and Civil Conspiracy Meet the Pleading Requirements established by Fed. R. Civ. P. 9(b).

The complaint also establishes the details of the fraudulent representations made to the Shchepins. In early 2016 (when), Hellman sent a letter from Massachusetts to the Shchepins in Moscow (who, where) purporting to be issued by Choate stating that the trust needed to be closed or they would lose the money. Hellman convinced the Shchepins that they should withdraw their money and transfer it to Mann by making two fraudulent representations, including that Choate did not want to do business with Russians, and that the trust funds would be "lost" if they were not withdrawn (what). Hellman, who purported to be a licensed attorney in Massachusetts, was familiar with Mann's business practices and deceitful conduct, and knew that these statements were false (what). Hellman used his status as an attorney, notary, and U.S. citizen to assist Mann in manipulating the Shchepins to entrust their money to Mann despite knowing that Mann intended to use the funds for himself (what).

Initially, Hellman denies that Mann misappropriated the funds at all by directing the court to a document he purports to be from a Russian bankruptcy proceeding which shows the Shchepins paid $1.2 million to co-plaintiff Osmanov. First, the court should disregard this document and the assertions associated with it because (a) it is an uncertified translation (b) that is not supported by an affidavit, and (c) the Motion does not include the original document in Russian. Second, the document raises factual questions—whether the money paid to Osmanov was the trust money in question, and whether Osmanov, as Mann's employee, was an unwitting pawn in the series of transactions which saw the trust funds withdrawn from Choate and ultimately transferred to Mann—that are not ripe for decision at the pleading stage.

Next, Hellman argues that if Mann did misappropriate the money, and Hellman did make the alleged statements knowing them to be false, such allegations are irrelevant because Mann

ultimately stole the money. Mann converting the funds, Hellman posits, was an intervening cause that forecloses Hellman's liability. The complaint alleges that Mann and Hellman acted in concert to defraud the Shchepins. Discovery will reveal the nuances of this arrangement. At the pleading stage, the plaintiffs are under no obligation to refute Hellman's statements of disputed facts for which discovery will provide answers. The allegations in the plaintiffs' well-pled complaint must be taken as true. Accordingly, the Shchepins should be permitted to proceed with discovery against Hellman.

## CONCLUSION

For these reasons, the plaintiffs respectfully request that the court deny defendant Michael Hellman's Motion to Dismiss.

PETR DMITRIEV, DARIA LATOUR,
YUSUP OSMANOV, YURI RYAZANOV,
ARSENIY SHCHEPIN, GEORGY
SHCHEPIN, and OLEG SEMENETS,
By their attorneys,

/s/ Lauren E. Sparks
Kenneth C. Pickering, BBO #634121
Lauren E. Sparks, BBO #693935
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502
kpickering@mirickoconnell.com
lsparks@mirickoconnell.com

Dated: September 2, 2021

## CERTIFICATE OF SERVICE

I, Lauren E. Sparks, hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 2, 2021

/s/ Lauren E. Sparks
Lauren E. Sparks