UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PETR DMITRIEV, DARIA LATOUR, YUSUP OSMANOV, YURI RYAZANOV, ARSENIY SHCHEPIN, GEORGY SHCHEPIN, and OLEG SEMENETS,<br><br>Plaintiffs,<br><br>v.<br><br>ANDREI MANN and MICHAEL HELLMAN,<br><br>Defendants. | Civ. Action No.<br>1:21-CV-40068-NMG |

# MEMORANDUM AND ORDER

**LEVENSON, U.S.M.J.**

## INTRODUCTION

Before the Court is Defendant Andrei Mann's[1] ("Mann") Motion to Disqualify the law firm representing Plaintiffs ("Plaintiffs' Counsel").[2]  Motion to Disqualify, Docket No. 42. The Motion to Disqualify seeks to prevent Plaintiffs' Counsel from representing individual plaintiffs Arseniy Shchepin and Georgy Shchepin (collectively, the "Shchepins") or, alternatively, from representing Plaintiffs entirely.  *Id.* at 15.

Plaintiffs have opposed the Motion to Disqualify.  *See* Opp. to Motion to Disqualify, Docket No. 51.

---

[1] Defendants Mann and Michael Hellman ("Hellman") are represented separately.  Docket Nos. 8-9.

[2] Kenneth C. Pickering and Lauren E. Sparks, of the firm Mirick, O'Connell, DeMallie & Lougee, LLP have appeared as counsel for all the plaintiffs in this case.  Docket No. 7.

The Court held a hearing on the Motion to Disqualify and reviewed *in camera* a Joint Representation and Tolling Agreement, which was filed, *ex parte*, by Plaintiffs. Docket Nos. 78, 80.

For the reasons discussed below, Mann's Motion to Disqualify is **DENIED**.

**A. Summary of Decision**

As discussed in detail hereafter, the gist of Mann's Motion to Disqualify is that Plaintiffs should be suing each other, instead of suing Mann.[3] Mann asserts that one of the plaintiffs, Yusup Osmanov ("Osmanov"), is responsible for harms that some of the other plaintiffs allege in the Complaint. Mann argues that his contention that one of the plaintiffs is the real wrongdoer gives rise to an impermissible conflict under Rule 1.7 of the Massachusetts Rules of Professional Conduct.[4] Mann asks the Court to remedy this claimed conflict by disqualifying Plaintiffs' Counsel. Mann's Motion to Disqualify further argues that Plaintiffs' Counsel was required, and failed, to sever representation when Mann notified counsel of conflicts between several of the plaintiffs.

Plaintiffs, for their part, counter that the execution of a joint representation agreement among them resolves any current concerns related to the asserted conflict.

Mann's motion invites the Court to put the cart before the horse. At this stage of the litigation, the Court is in no position to pre-judge the merits of the parties' respective allegations. Plaintiffs have elected to pursue the claims in their Complaint, and they are entitled to go forward with counsel of their own choosing. If Mann ultimately persuades the Court that

---

[3] If the plaintiffs *were* actually suing each other, there would be a conflict that might indeed preclude counsel from representing all, or perhaps any, of the plaintiffs.

[4] The Massachusetts Rules of Professional Conduct are, with limited exceptions, the Rules of Professional Conduct for this Court. *See* Local Rule 83.6.1.

one or more of the plaintiffs are the real wrongdoers – or, if some of the plaintiffs become persuaded of this along the way – then the potential conflict that Mann identifies may ripen. Unless and until that happens, however, there is no basis for the Court to disturb Plaintiffs' choice of counsel.

### B. The Allegations of the Complaint

Plaintiffs allege in the Complaint that Mann, in some instances acting together with Hellman, convinced the individual plaintiffs to loan, invest, or otherwise entrust large sums of money with Mann over the course of almost a decade. Complaint, Docket No. 1 at ¶ 16. While the allegations vary in each instance alleged, in general Plaintiffs claim that the defendants failed to meet terms of repayment or otherwise converted money entrusted to them.

In several instances, Plaintiffs allege that they were each injured in transactions that involved similar patterns of conduct by the defendants. For example, Osmanov allegedly knew Mann through a business relationship in Russia and on multiple occasions agreed to loan money to Mann, in large part based on representations about Mann's purported business successes. According to the Complaint, Mann (through Hellman) made some repayments on the original loans, but later requested extensions of repayment deadlines and eventually stopped making payments to Osmanov. *See id.* at ¶¶ 69-85. Plaintiff Petr Dmitriev ("Dmitriev"), by comparison, is a former coworker who was impressed by Mann's purported success and agreed to loan Mann money in anticipation of future interest payments. The Complaint alleges that Mann executed loan documents with the assistance of Hellman, repeatedly extended repayment deadlines, and ultimately failed to repay the loan from Dmitriev. *See id.* at ¶¶ 22-42.

A second theme in the Complaint (albeit not directly pertinent to the motion at bar), is that many of Plaintiffs' allegations relate, in one way or another, to business entities that Hellman registered in Massachusetts. *See id.* at ¶¶ 13, 25, 26, 72, 96.

### C. The Allegations of Defendant Mann's Counterclaim

Mann and Hellman filed separate motions to dismiss the Complaint (Docket Nos. 10, 12), which Judge Gorton subsequently denied (Docket No. 29). Shortly thereafter, Mann filed the present Motion to Disqualify, as well as five counterclaims against Plaintiffs and two third-party complaints (against three other individuals).[5] Docket Nos. 35-41. These counterclaims and third-party complaints allege that Mann is himself a victim of various frauds by Plaintiffs and others.[6]

Consonant with Mann's counterclaims, the factual predicate for Mann's present motion is his assertion that Osmanov, not Mann, embezzled $1.2 million from a trust that had been opened for the Shchepins.[7] *See* Motion to Disqualify, Docket No. 42 at 6-10. In Mann's words, "there is a $1.2 million controversy between Plaintiff and Defendant in Counterclaim YUSUP OSMANOV (OSMANOV), on the one hand, and two brothers, ARSENYI SHCHEPIN and GEORGY SHCHEPINS." *Id.* at 2. Mann further contends that Osmanov "seized control of MANN's documentation" and concealed "the approved repayments" of other

---

[5] Mann filed a Counterclaim against plaintiffs Daria Latour and the Shchepins, a Counterclaim against plaintiff Petr Dmitriev, a Counterclaim against plaintiff Osmanov, a Counterclaim against plaintiff Yuri Ryazanov, and a Counterclaim against plaintiff Oleg Semenets. Docket Nos. 35-39. Mann also filed one Third Party Complaint against Suleiman Guseinov and Aleksay Petrov and another Third-Party Complaint against Arsen Komutaev. Docket Nos. 40-41.

[6] Hellman did not join Mann's counterclaims, third-party complaints, or the Motion to Disqualify.

[7] The Complaint, by contrast, blames Mann, rather than Osmanov, for the alleged defalcation. *See* Complaint, Docket No. 1 at ¶¶ 62-64.

plaintiffs' loans for the purpose of "embezzling those [repayments] as his own money." *Id.* Mann also asserts that Osmanov "converted the financial records memorializing the repayments" of a loan to plaintiff Daria Latour. *See id.* at 11.

In support of his contention that Osmanov converted the Shchepins' trust funds, Mann attaches a Russian-translated document which is identified as a ruling from the Arbitration Court of the City of Moscow, dated May 14, 2021, concerning the bankruptcy of Mann ("Arbitration Ruling"). In pertinent part, the Arbitration Ruling recites that on July 8, 2016, Arseniy Shchepin and Georgiy Shchepin transferred approximately 41 million rubles, each, to Osmanov. *See* Motion to Disqualify, Docket No. 42 at 6. The Arbitration Ruling further recites that Mann's creditor (who apparently initiated the arbitration proceeding) presented to the Russian court documentary evidence that confirmed the transfers. *See id.* Mann reports that he provided a copy of the Arbitration Ruling to Plaintiffs' Counsel. *See id.* at 7. The Motion also notes that documentation concerning the Shchepins' trusts, produced by the law firm Choate, Hall & Stewart, LLP, does not identify Mann. *See id.* at 8-9.

On the basis of his factual assertions, Mann argues that joint representation of Osmanov and the other plaintiffs, particularly the Shchepins, creates a reasonable likelihood of a conflict, either at present or in the future. This actual or inchoate conflict, Mann argues, precludes joint representation of Osmanov and the other plaintiffs.

### D. Procedural Posture

On August 19, 2022, Judge Gorton referred this case to the undersigned magistrate judge for pretrial proceedings, including the present Motion to Disqualify. Docket No. 69. The present motion falls squarely within the ambit of 28 U.S.C. § 636(b)(1)(A), which permits the district judge to designate a magistrate judge "to hear and determine any pretrial matter pending

5

before the court," excepting various dispositive motions. 28 U.S.C. § 636(b)(1)(A). Courts have routinely found that a motion to disqualify does not constitute a "dispositive motion" and may be determined by a magistrate judge. *See, e.g.*, *Allstate Ins. Co. v. Inscribed PLLC*, 571 F. Supp. 3d 823, 826 n.2 (E.D. Mich. 2021). Accordingly, the Court has authority to conduct a hearing and issue a determination on the Motion to Disqualify.

### E. Analysis

In his Motion to Disqualify, Mann effectively invites the Court to adjudge the truth of the parties' competing claims about who did what. Mann argues that his evidence shows that Osmanov converted the Shchepins' trust fund money, not Mann. *See* Motion to Disqualify, Docket No. 42 at 6-10. If Mann's version is correct, he contends, Plaintiffs' Counsel are on notice that a conflict between Osmanov and the Shchepins either exists, or is reasonably likely to exist in the future, such that Plaintiffs' Counsel must discontinue their joint representation. *See id.* at 7.

In opposing the Motion to Disqualify, Plaintiffs' Counsel has represented to the Court that Plaintiffs have entered into a joint representation agreement that resolves the conflict of interest concerns that Mann raises. While Plaintiffs contest the facts underlying Mann's Motion to Disqualify, they do not urge the Court to resolve the factual issue at this time. Instead, Plaintiffs argue that the written and signed joint representation agreement reflects the various plaintiffs' informed consent and effectively waives any potential conflict.

#### i. Limitations on the Court's Role in Supervising Parties' Choice of Counsel

To begin with, it is worth noting the extraordinary posture of the present motion.

This is *not* a case in which someone who has been, or currently is, represented by a particular attorney seeks to vindicate an interest arising from that person's relationship with

counsel. Such cases arise with some regularity. *See, e.g., ebix.com, Inc. v. McCracken*, 312 F. Supp. 2d 82, 94 (D. Mass. 2004) (claim that attorney's ongoing representation of current client would compromise confidentiality of communications by prior client); *Adoption of Erica*, 426 Mass. 55, 61 (1997) (reviewing criteria used to test claims that an attorney should be disqualified because of a conflict arising from the representation of a former client). Nor is this one of those relatively common cases in which a lawyer is also a key witness. *See, e.g.*, *Carta ex rel. Estate of Carta v. Lumbermens Mut. Cas. Co.*, 419 F. Supp. 2d 23, 29 (D. Mass. 2006).

By contrast, this is a case in which one party asks the Court to undo his opponents' choice of counsel, based on a conflict in which the movant has no direct interest. Mann does not claim to have any relationship with the lawyers he seeks to disqualify. He does not claim that any of his privileged communications or confidences are in jeopardy. Indeed, he does not seek to vindicate any identifiable interest of his own – apart from the evident tactical value of costing the Plaintiffs time and expense. Mann simply asserts that some or all of the plaintiffs have a mistaken view of the facts and therefore misunderstand where their own true interests lie.

In the *criminal* context there is precedent for a relatively open-ended judicial inquiry into the potential conflicts that may arise when multiple defendants are jointly represented. In the First Circuit this is known as a *Foster* hearing. *See United States v. Foster*, 469 F.2d 1 (1st Cir.1972).[8] But that duty of inquiry arises because the Sixth Amendment right to counsel in criminal cases includes a "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia,* 450 U.S. 261, 271 (1981). There is no real counterpart to a *Foster*

---

[8] In such a hearing the court is required to "comment on some of the risks confronted where defendants are jointly represented to ensure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney, and whether they understand that they may retain separate counsel[.]" *Foster,* 469 F.2d at 5.

7

hearing in civil cases. As the First Circuit has noted, *Foster* only applies to "criminal prosecutions where one attorney speaks for two or more defendants." *United States v. Sotomayor–Vazquez*, 249 F.3d 1, 16 (1st Cir. 2001).

Even in the criminal context, it is critical to note, potential conflicts may generally be waived. Indeed, the purpose of a *Foster* hearing is to evaluate "whether there is an intelligent and competent waiver by the accused," of the foreseeable conflict. *Yeboah-Sefah v. Ficco*, 556 F.3d 53, 68 (1st Cir. 2009) (quotation omitted). Furthermore, the Court is not required to chase down potential conflicts, beyond obtaining appropriate assurances of counsel. *See United States v. Santiago-Lugo*, 167 F.3d 81, 84 (1st Cir. 1999) ("[A]lthough a district court must inquire when advised of a potential conflict of interest, the court may rely on counsel's representations that no such conflict exists."). Even in criminal cases, where the court has a duty to inquire into potential conflicts, courts caution that "[d]isqualification of counsel is a remedy of last resort, and '[t]he government bears a 'heavy burden' in demonstrating that disqualification is justified[.]'" *United States v. Gorski*, 36 F. Supp. 3d 256, 265 (D. Mass. 2014) (quoting *In re Grand Jury Proceedings*, 859 F.2d 1021, 1026 (1st Cir.1988)).

In civil cases like this one, the role for courts to second-guess a party's choice of counsel is even more limited. When a party seeks to disqualify counsel based on a conflict of interest, it is the moving party that bears the burden of proving the conflict. *See ebix.com, Inc. v. McCracken*, 312 F. Supp. 2d 82, 90–91 (D. Mass. 2004). And both state and federal courts in Massachusetts have urged caution in considering such motions to disqualify. As the Supreme Judicial Court has noted, "[d]isqualification, as a prophylactic device for protecting the

8

attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Adoption of Erica*, 426 Mass. 55, 58 (1997) (quotation omitted).[9]

The courts have repeatedly recognized that there is a high danger for misuse of motions to disqualify counsel when raised by an opposing party. *See, e.g.*, *Kevlik v. Goldstein*, 724 F.2d 844, 848 (1st Cir. 1984) ("Disqualification motions can be tactical in nature, designed to harass opposing counsel, and . . . the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons.") (quotation omitted); *Adoption of Erica,* 426 Mass. at 64-65 ("We have noted our concern about the high cost to litigants and to the court system occasioned by motions to disqualify attorneys, especially when such motions are used as harassment and dilatory tactics."); *Gorovitz v. Plan. Bd. of Nantucket,* 394 Mass. 246, 250 (1985) ("The high costs of attorney disqualification on litigants and on the court system militate against the indiscriminate allowance of disqualification motions.").

In civil cases, the court does *not* play an inquisitorial role in policing potential conflicts. Rather, it falls to counsel for each party to attend to their respective ethical obligations. As the Supreme Judicial Court has emphasized, "first and foremost, the code [predecessor to the Rules of Professional Conduct] is self-executing. We expect lawyers to know and comply with its provisions." *Borman v. Borman,* 378 Mass. 775, 787 (1979). Short of a fundamental taint on the legal system, that is the end of the matter; "[w]hen a lawyer, exercising his best judgment, determines that his employment will not bring him into conflict with the code, disqualification may occur only if the trial court determines that his continued participation as counsel taints the legal system or the trial of the cause before it." *Id.* at 788 (addressing claim that a lawyer should be disqualified because he was a prospective witness).

---

[9] The decisions of the Supreme Judicial Court have particular bearing here because, as noted above, the Massachusetts Rules of Professional Conduct supply the pertinent standard. See Local Rule 83.6.1.

ii. **Ethical Standards Governing Conflicts Among Clients**

As noted above, the relevant standard here comes from Rule 1.7 of the Massachusetts Rules of Professional Conduct, which states,

> [A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Mass. R. Prof. C. 1.7(a).

Not only does Rule 1.7 describe the contours of a concurrent conflict, it also prescribes the mechanism for addressing actual and potential conflicts. Rule 1.7 outlines a procedure for addressing concurrent conflicts, as follows:

> [A] lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing.

Mass. R. Prof. C. 1.7(b).

When there are actual or potential conflicts among jointly represented individuals, the attorney is called upon to identify such conflicts and, if the parties elect to proceed with joint representation, the attorney should memorialize that waiver in a signed document. Plaintiffs' Counsel represented to the Court that they have done this, and they have provided a copy of the document for *in camera* review. Specifically, Plaintiffs' Counsel attest that their representation of Plaintiffs "does not involve the assertion of a claim by one Plaintiff against another Plaintiff in the same litigation or in any tribunal," that "Plaintiffs have also been informed of the specific allegations made by Defendant Andrei Mann in his counterclaims and Motion to Disqualify,"

and that "Plaintiffs have executed a joint representation agreement, made in writing and with informed consent." Opp. to Motion to Disqualify, Pickering Aff., Docket No. 51-1 at ¶¶ 3, 5, 7.

### iii. Mann's Factual Contentions Are Not Ripe For Resolution

Mann is adamant that Plaintiffs should be suing each other, and not suing him. In effect, he argues, Plaintiff's Counsel should be disqualified because Mann expects to win the case on the merits. But the record is not developed enough for the Court to express a view as to the merits of Mann's position. *See also* Order, Docket No. 30 at 8 (denying Mann's motion to dismiss for failure to state a claim, on the grounds of Russian choice-of-law analysis, "where that determination would be premature due not only to the failure of the parties to provide a full and reliable statement of the foreign law in question but also to the *undeveloped factual record*.") (emphasis added) (quotations omitted).

Nor is the Court persuaded by Mann's suggestion that the issue in the present case can be resolved upon the face of a simple documentary submission. In support of his contention that Osmanov, and not Mann, is responsible for a $1.2 million defalcation, Mann points to a record that is cited in the Arbitration Ruling. The record, he contends, shows that a transfer entry associated with the movement of money from Russian accounts bears Osmanov's name. *See* Motion to Disqualify, Docket No. 42 at 6.

A review of the parties' pleadings and motions – on both sides – undercuts any suggestion that the documentary record, at least as currently assembled, can by itself support a definitive judgment about what happened. The parties' pleadings are a welter of allegations and counter allegations about transactions that were apparently conducted on the basis of oral undertakings, with various payments being made in cash, and with various individuals acting as intermediaries (faithful or otherwise). It appears that both sides are united in their contention

11

that the operative events, and their legal implications, were not uniformly captured in any undisputed documentary record.

Assuming the translations submitted are accurate, there does appear to be a reference in the Arbitration Ruling to certain transfers between the Shchepins and Osmanov. But it also appears that this reference is included as support for the arbitrator's determination that sufficient funds exist to satisfy Mann's creditor; there does not appear to be any finding about the significance of the entry with respect to any claims among the parties to this litigation.

Nor do the circumstances of this litigation suggest that this is as simple a matter as Mann suggests. Both Plaintiffs and Mann identify Osmanov as a former colleague, agent and or business associate of Mann, and both sides allege that Osmanov acted at Mann's direction at various times. *See* Complaint, Docket No. 1, at 10 ("Mann, in turn, gave Osmanov a job as the head of the Moscow office of First Crandall Construction, Inc."); *See* Motion to Disqualify, Docket No. 42 at 4 ("Yet, as the pleadings show, from about 2017, MANN learned from reliable sources that OSMANOV engaged in activities without MANN's or CRANDULL's authorization."). Assuming Mann is correct in asserting that his documents demonstrate that there is a bank withdrawal record which bears Osmanov's name, the legal significance of that fact – taken in isolation – is doubtful at best.

      **iv.**    **Plaintiffs Have Effectively Waived Any Present Conflict**

There is nothing in the record to suggest that any of the plaintiffs have asserted claims against one another in this litigation, or in any other tribunal. Under Rule 1.7, it is for the parties and their counsel, not the court, to assess the appropriateness of their representation. The mere prospect that some of the plaintiffs could – in the future – be persuaded that they

should be suing one another, rather than Mann, does not provide a basis for depriving them of counsel of their choosing.

Here, the affidavit from Plaintiffs' Counsel demonstrates that Plaintiffs are aware of Mann's theory of the case and have not chosen to assert claims against one another. *See* Opp. to Motion to Disqualify, Pickering Aff., Docket No. 51-1 ("The Plaintiffs have also been informed of the specific allegations made by Defendant Andrei Mann in his counterclaims and Motion to Disqualify Mirick O'Connell."). The Court has reviewed *in camera* the joint representation agreement. The document reflects, on its face, that Plaintiffs executed the agreement and consented to the joint representation, having been informed of potential conflicts of interest. Accordingly, the joint representation agreement and the attestations from Plaintiffs' Counsel satisfy the procedural requirements of Rule 1.7(b).[10]

The cases cited by Mann do not point to any different outcome. In *Bryan Corp. v. Abrano*, the court found that a lawyer had violated Rule 1.7 by undertaking representation of a new client where it was reasonably likely that a conflict of interest either existed or would materialize with an existing client. *See* 474 Mass. 504, 514 (2016). Nothing in that decision, however, limits the force of a written waiver. To the contrary, the Supreme Judicial Court expressly recognized that a "prudent attorney" in such a circumstance would have either "declined representation *or disclosed the conflict to an appropriate . . . representative who*

---

[10] Mann's counsel suggested at oral argument that he should be permitted to review the waiver document on a "counsel only" basis. The Court – by reviewing the consent document *in camera* – has already intruded into privileged communications and agreements between Plaintiffs and their counsel. There is no good reason, and the Court is aware of no authority, to warrant a wholesale invasion of the attorney-client privilege of the sort Mann's counsel suggests. The Court has broad discretion to review documents *in camera* and *ex parte* when the documents may be protected by privilege. *See In re The City of New York*, 607 F.3d 923, 948 (2d Cir. 2010) (trial judge may permit *ex parte* submission of "potentially privileged documents . . . in the exercise of its informed discretion and on the basis of the circumstances presented").

*could consent to the dual representation.*" *Id.* (emphasis added).  Here, we have counsel's attestation that Plaintiffs' Counsel has disclosed Mann's theory of a conflict between Osmanov and the Shchepins to the Plaintiffs and has obtained their informed consent to the joint representation.

Mann's citation of *Matter of Ablitt*, 486 Mass. 1011 (2021), does not help his argument.  In that case, the Supreme Judicial Court upheld the disbarment of an attorney who had entered an agreement to assign client files to an entity from which the attorney had sought a loan.  *See Matter of Ablitt*, 486 Mass. at 1019.  The court found that by "by failing to obtain his clients' informed consent" prior to such conduct, the attorney had divulged confidential information and "materially limited his ability to represent his clients" due to his financial motivations and obligations to the entity.  *Id.* at 1015.  The facts of *Matter of Ablitt* are, on their face, far afield from the matter at bar; there has been no allegation that Plaintiffs' Counsel has breached any client confidences.[11]

Mann's motion also discusses legal authority concerning breach of fiduciary duty and legal malpractice claims.  *See* Motion to Disqualify, Docket No. 42 at 14.  However, at issue here is a motion to disqualify counsel brought by opposing counsel, not an affirmative claim against an attorney by a current or former client.  Mann's argument that the Court should disqualify counsel based on *potential* affirmative claims that Plaintiffs could bring in the future against Plaintiffs' Counsel is speculative and not grounds for disqualification.  *Cf. Cornwell Ent., Inc. v. Anchin, Block & Anchin, LLP*, 830 F.3d 18, 36 (1st Cir. 2016) (finding that the

---

[11] It is undoubtedly true that one of the ways a disqualifying conflict may arise is that a lawyer may possess confidential information received from one client, which he would be barred from using against another client.  Indeed, the Court expressly noted at the hearing on Mann's Motion to Disqualify that Plaintiffs' Counsel could be in a very difficult position if Mann's factual allegations prove accurate.  Among the problems would be challenges relating to the obligation to protect client confidences if any of the plaintiffs were to sue one another.

14

district court did not abuse its discretion in denying a motion to disqualify counsel that was not supported by evidence).

Plaintiffs correctly note that the Motion to Disqualify fails even to argue that the individual plaintiffs were somehow foreclosed from consenting to joint representation and waiving the conflict of interest that Mann asserts.  Plaintiffs, commendably, point the Court to some out-of-circuit cases in which courts have refused to permit waivers of conflicts of interest – even with informed consent of the conflicted parties.  *See* Opp. to Motion to Disqualify, Docket No. 51 at 6.  But none of these cases suggests that there is a non-waivable conflict in the present circumstances of the matter at bar.  Mann, moreover, did not raise any such argument either in the Motion to Disqualify or at the hearing; accordingly, the Court need not consider it. *See Napert v. Gov't Emps. Ins. Co.*, No. 13-CV-10530-FDS, 2013 WL 3989645, at *2 n.4 (D. Mass. Aug. 1, 2013) (arguments not raised in moving papers may be disregarded as waived).

## CONCLUSION

For the reasons set forth above, the Motion to Disqualify Mirick, O'Connell, Demallie & Lougee, LLP From Representing Seven Plaintiffs Based On Impermissible Conflict (Docket No. 42) is **DENIED**.[12]

September 13, 2022

SO ORDERED,

/s/ Paul G. Levenson
PAUL G. LEVENSON
UNITED STATES MAGISTRATE JUDGE

---

[12] The parties are advised that under Rule 72(a) of the Federal Rules of Civil Procedure and Rule 2(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party seeking review by a district judge of these determination(s) and order(s) must serve and file any objections within fourteen (14) days of being served a copy of this order, unless a different time is prescribed by the magistrate judge or the district judge. *See* Fed. R. Civ. P. 72(a). Such objections must specifically designate the order, or part, to be modified or set aside and the basis for objection. The district judge will set aside any portion of the magistrate judge's order that is found to be clearly erroneous or contrary to law. The parties are further advised that failing to follow the objection procedures of Rule 2(b) may preclude further appellate review. *See Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 4 (1st Cir. 1999); *Sunview Condo. Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964-65 (1st Cir. 1997).